652 P.2d 134

**TRANSPORT INDEMNITY COMPANY, a corporation; and Illinois-California Express, Inc., a corporation, Plaintiffs-Appellees and Cross-Appellants,**

v.

**CAROLINA CASUALTY INSURANCE COMPANY, a corporation, Defendant-Appellant and Cross-Appellee.**

No. 15660.

Supreme Court of Arizona,
In Division.

Sept. 30, 1982.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears by Thomas A. McGuire, Phoenix, for plaintiffs-appellees and cross-appellants.

Gust, Rosenfeld, Divelbess & Henderson by Richard A. Segal, Phoenix, for defendant-appellant and cross-appellee.

FELDMAN, Justice.

This is an appeal from a judgment rendered on cross motions for summary judgment in a declaratory judgment action between two insurance carriers, both of whom claim to be excess insurers against the loss arising out of a vehicular accident. The court below ruled that both the insurers were "primarily liable" for any damages. Both insurers appealed, each claiming to be excess and urging that the other is primary. We have jurisdiction pursuant to Rule 19(e), Rules of Civil Appellate Procedure, 17A

A.R.S. and Art. 6, § 5, Arizona Constitution.

The dispute between these insurers is but one more battle in a war commenced long ago between the insurers that write coverage for interstate truck lines and those that cover "independent" truckers who lease their rigs to the interstate lines.[1] Over-simplified for purposes of clarity, the basic issue presented is whether primary coverage for an interstate trucking rig, driven on a trip lease, is provided by the insurer for the owner-lessor or that of the certificated lessee.

## FACTS

The facts underlying this arcane question are as follows. On March 13, 1977, Jerry Works, an employee of Harold Powell, dba Powell Trucking, was operating tractor-trailer equipment owned by Powell. Works was involved in an accident which took place in Arizona and in which one Jack Ripley was seriously injured. Ripley filed a tort action against Works and Powell.

Illinois-California Express, Inc. (ICX) is an interstate carrier licensed by the Interstate Commerce Commission (ICC). At the time of the accident, the Powell truck was operating under ICX placards because Powell had entered into a "trip lease" with ICX. The lease provided that Powell would provide the tractor, trailer and driver, and would haul a load arranged by ICX for one of ICX's customers over routes authorized by the ICC for travel by ICX. According to the lease, Powell was to receive 80% of the revenue from the transport of the load and ICX was to receive 20%. Ripley did not join ICX as a defendant in the tort action. The reason for this is unexplained.

Powell's rig was insured for motor vehicle liability under a policy issued by Carolina Casualty Insurance Company (Carolina), while ICX, the lessee, was insured under a policy issued by Transport Indemnity Company (Transport).

---

1. See *Carolina Casualty Insurance v. Transport    Indemnity Co.,* 488 F.2d 790 (10th Cir. 1973).

The use of leased equipment by licensed interstate motor carriers is a common practice and is recognized by the Interstate Commerce Act. The act provides that the ICC may prescribe regulations respecting such use and that such regulations may be those which are "reasonably necessary in order to insure that while motor vehicles are being ... used [under lease] the motor carriers will have full direction and control of such vehicles and *will be fully responsible* for the operation thereof ... *as if they were the owners* of such vehicles ...." 49 U.S.C. § 304(e) (emphasis added). The lease between ICX and Powell was subject to regulations which had been made by the ICC to cover such trip leases. The regulations mandate that such trip leases "provide for the exclusive possession, control and use of the equipment, and for the *complete assumption of responsibility in respect thereto, by the lessees* ...." 49 C.F.R. § 1057.4 (emphasis added.)[2]

The statutory enactment and regulations promulgated thereunder were intended to correct abuses historically incident to the use of leased equipment by licensed motor carriers. The law was designed to prevent the operation of unregulated, uninsured or underinsured vehicles on interstate trips by imposing responsibility for operation of trip-leased vehicles on the lessee holding the ICC certificate of convenience and necessity for the route to be traveled. *American Trucking Association v. United States*, 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953); *Cox v. Bond Transportation, Inc.*, 53 N.J. 186, 249 A.2d 579 (1969). In addition, Congress intended to put the use and operation of leased equipment on a parity with the use of equipment owned by the authorized carrier and operated by its own employees,

in effect making the driver of the leased unit a statutory employee of the lessee. *See Brannaker v. Transamerican Freight Lines, Inc.*, 428 S.W.2d 524 (Mo.1968); *Cox v. Bond Transportation, Inc., supra; Mellon National Bank & Trust Co. v. Sophie Lines, Inc.*, 289 F.2d 473, 477 (3d Cir. 1961), holding that federal law creates an irrebutable presumption that the lessor's driver is the employee of the lessee whose placards identify the vehicle.

Pursuant to the requirements of the ICC regulations, the lease between ICX and Powell contained clauses by which the lessee, ICX, assumed full responsibility with respect to the Powell equipment and by which Powell surrendered "full control, possession and management of said equipment" to ICX. Further in accordance with ICC regulations, the insurance policy issued by Transport to ICX contained the following endorsement, known as the "ICC endorsement":

> In consideration of the premiums stated in the policy to which this endorsement is attached, [Transport] hereby agrees to pay ..., any final judgment recovered against the insured for bodily injury ... resulting from negligence in the operation, maintenance or use of motor vehicles under certificate of public convenience and necessity or permit issued to [ICX] by the Interstate Commerce Commission ....
>
> ... It is further understood and agreed that *no condition, provisions, stipulation or limitation contained in the policy ... shall relieve the company from liability hereunder ....*

(Emphasis supplied.)

The Transport policy[3] also contained an "Other Insurance" clause which provided

---

2. Federal law and ICC regulations also require the licensed carrier to show proof of financial responsibility for the protection of the public by filing bonds or insurance policies covering against payment of any judgment against the carrier for bodily injury resulting from negligent operation of any motor vehicle used under the carrier's certificate. *See* 49 U.S.C. § 315; 49 C.F.R. § 1043.1 (1977).

3. Actually, there are two Transport policies which apply to this accident. The first, with limits of $100,000, was written pursuant to the requirements of federal law. In addition to this "underlying coverage" there is an "Excess Insurance Contract" with limits of $9,900,000. For reasons which appear later in this opinion, only the "underlying policy" is relevant. To further complicate the situation, the underlying Transport policy provides for retention (i.e., self-insurance) by the insured—a form of de-

that the insurance extended by Transport under the policy should be excess over any other valid and collectible insurance covering any particular accident. The policy which Carolina issued to Powell contained a similar other insurance clause. However, because Powell was not certificated by the ICC, the Carolina policy did not have an ICC endorsement. The Carolina policy did include a so-called "Truckmen's Endorsement" which provided:

> The insurance [provided by this policy] does not cover ... any person or organization ... engaged in the business of transporting property ... for others ... if the bodily injury or property damage occurs while such [truck] is not being used exclusively in the business of [Powell] and over a route [Powell] is authorized to serve by federal or public authority ....

The Truckmen's Endorsement in the Carolina policy also contained a specific excess clause applicable to the accident which gave rise to this case and which provided as follows:

> With respect to (1) any [truck] of the commercial type while leased or loaned to any person or organization ... engaged in the business of transporting property by [truck] for others ... [this] insurance ... shall be excess over any other valid and collectible insurance, whether primary, excess or contingent, available to the insured. Otherwise, the insurance under this endorsement is primary insurance.

(Emphasis in original omitted.)

Unable to reach an agreement as to payment of the loss, Transport and ICX filed this declaratory judgment action to determine the respective duties and liabilities between the two insurers. In a motion for summary judgment, Transport asserted

that if its policy covered the loss at all, it should be excess to the policy issued by Carolina, and on a cross-motion for summary judgment Carolina argued that Transport's policy was primary and that its policy was excess. By judgment entered on October 25, 1979, the court below ruled that both Transport and Carolina were "primarily liable for any judgment" and "are equally and jointly responsible ... to the extent of the respective limits, dollar for dollar." Carolina filed this appeal from that judgment and Transport took a cross-appeal.

## PERSONS INSURED

The Carolina policy contains a so-called omnibus clause. This clause is required[4] in a policy issued to the owner of a vehicle and expressly extends coverage not only to the owner, who is the named insured (Powell), but also to those driving the vehicle with permission of the named insured. The Carolina policy also covers those "legally responsible" for the use of the vehicle at the time of the accident. Since Powell's employee, Works, was driving the vehicle with Powell's permission at the time of the accident, he would be an insured under the omnibus clause of the Carolina policy. So, also, would ICX, because as lessee federal law made it "legally responsible" for the use of the vehicle.

On the other hand, Transport's policy provides nonownership coverage and thus need not contain omnibus coverage.[5] Transport's policy expressly limits the persons insured to the named insured, ICX, and its officers and directors. However, under federal law, ICX, a lessee of the equipment, is treated "as if [it] were the owner of the vehicle." 49 U.S.C. § 304(e). Although the federal statutes do not expressly require the licensed motor carrier's policy to cover any person other than the licensed carrier itself,

---

ductible—for the first $50,000 of any loss. The Carolina policy contains no deductible clause. The issues raised by this situation are treated later in this opinion.

**4.** Such clauses are required by most state financial responsibility laws. See A.R.S. § 28–1170 B. Powell's truck was registered and

principally garaged in Texas. The Texas financial responsibility law is Texas Rev.Civ.Stat. Ann. art. 6701h, § 1 et seq. (Vernon 1977).

**5.** See A.R.S. § 28–1170 C, which provides: "The operator's policy ... shall insure the persons named as insured therein ...."

they do require that a policy such as Transport's be certified as proof of the lessee's financial responsibility for its obligation as if it "were the owner." 49 U.S.C. § 315. Presumably for this reason, Transport and ICX concede that if Transport covers the occurrence at all, Works and Powell are also insureds under its policy.[6]

Thus, we conclude that both ICX, which was not sued, and Works and Powell, who were made defendants in the tort action, are covered under both policies.[7]

## GENERAL COVERAGE PROBLEMS

■ Transport first claims that Carolina is the only insurer for this accident. The argument is based on the contention that the Transport policy provides no coverage at all because it covers Powell and Works as insureds only for an "occurrence . . . arising out of the occupation of the named insured (ICX) . . . ." Transport argues that the accident—which admittedly occurred while Works was driving with ICX placards on an ICX-Powell lease and while Works was en route to the destination to which ICX had directed him—did not arise out of ICX's occupation because nothing about the ICX business itself caused the accident. Transport argues, rather, that the occurrence "arose out of" Works' negligence, not "the occupation" of ICX. The argument is sophistic. The occurrence "arises out of" the insured's business when there is a "causal nexus" sufficient to warrant the conclusion that the accident is "incident to or connected with" the use of the vehicle in the business of the named insured. *National Farmers Union Property and Casualty Co. v. Western Casualty & Surety Co.,* 577 P.2d

961, 963 (Utah 1978); *Vanguard Insurance Co. v. Cantrell,* 18 Ariz.App. 486, 498, 503 P.2d 962, 964 (1973). The causal connection required is not proximate cause; i.e., the business of the named insured need not have caused the occurrence, it need only be related to it. *Blue Bird Body Co. v. Ryder Truck Rental,* 583 F.2d 717, 726 (5th Cir. 1978). Under the admitted facts here, the accident was one "arising out of" the occupation of the Transport's named insured, ICX.

■ We note that the Carolina Truckmen's Endorsement provides first that there shall be no coverage at all for a person ". . . engaged in the business of transporting property for others" if the accident occurs while the insured vehicle is not being used over a route for which the named insured (Powell) held a certificate. However, the coverage denied by this portion of the endorsement is later granted by a subsequent paragraph of the same endorsement, which provides that where the vehicle is being used for transporting property under lease to any person ". . . engaged in the business of transporting property by [truck] for others . . ." the insurance shall be excess over any other applicable insurance. It is impossible to reconcile these two clauses.[8] In the face of such a contradiction, the clause which extends excess coverage "must be preferred over the clause absolutely denying it." *Transport Indemnity Co. v. Home Indemnity Co.,* 535 F.2d at 238. In any event, Carolina concedes liability as an excess carrier. We conclude, therefore, that both policies provide coverage for the accident.

6. Transport states on page 15 of its opening brief:

"Neither Powell Trucking nor Jerry Works are named insureds under the Transport policy. In order to obtain coverage they must be a person or firm 'to whom insurance protection has been extended under the policy.' For bodily injury liability, the policy insures anyone incurring liability as a result of an occurrence 'arising out of the occupation of' ICX, the named insured."

The only ground asserted by Transport and ICX for complete lack of coverage is the question of whether this action arose "out of the occupation of" ICX.

7. Cf. *Carolina Casualty Insurance Company v. Transport Indemnity Company,* 488 F.2d 790 (10th Cir. 1973).

8. Indeed, the Truckmen's Endorsement has been described as a "peculiarly incomprehensible" document. *Transport Indemnity Co. v. Home Indemnity Co.,* 535 F.2d 232, 237 (3d Cir. 1976).

## OTHER INSURANCE AND EXCESS PROVISIONS—THE EFFECT OF THE ICC ENDORSEMENT

We are thus faced with two policies which covered the accident and provide indemnity for the tort liability of all prospective defendants. Both policies contain excess clauses applicable in the event there is any other valid, collectable insurance. The Carolina policy contains a specific excess provision in the Truckmen's Endorsement, applicable where the insured vehicle is used under lease to a motor carrier. The Transport policy in this case is issued and certified pursuant to federal regulations which require the licensed common carrier to provide proof of financial responsibility by insurance or otherwise and to certify the existence of any such insurance by filing a certificate with the ICC. The certificate states that no provision of such insurance policy "shall relieve the company from liability." Of considerable importance here, the endorsement was physically attached to the Transport policy which was issued in this case.

With these factors in mind, we now address the contentions of the parties. Carolina claims it is the excess insurer and Transport the primary insurer because the Carolina policy contains a specific excess clause while the excess clause in the Transport policy is rendered unenforceable by virtue of the provisions of the Interstate Commerce Act and the regulations that were enacted thereunder. Substantial authority exists for this position. *See, e.g., Argonaut Insurance Co. v. National Indemnity Co.,* 435 F.2d 718 (10th Cir. 1971), the leading case on Carolina's side of the argument; *Allstate Insurance Co. v. General Fire and Casualty Co.,* 348 F.Supp. 682 (E.D.Pa. 1972); *Hagans v. Glen Falls Insurance Co.,* 465 F.2d 1249 (10th Cir. 1972). The rationale of this position is set forth in *Argonaut, supra,* as follows:

> The ICC endorsement, although not expressly referring to the "other insurance" provisions, says that no condition, provision, stipulation or limitation of the policy "shall relieve the company [the insurer] from liability hereunder." If the Argo-naut position is accepted, it will be relieved from any liability except for excess coverage. We believe that the effect of the endorsement was to make Argonaut the primary insurer.
>
> ... Argonaut cannot escape the plain terms of its insuring agreement in this case. The ICC endorsement imposes primary liability and eliminates any need for consideration of the effect of the identical "other insurance" clauses.

435 F.2d 720–21.

Transport contends, on the other hand, that since there is enough coverage available from one source or another to satisfy the claims of the injured member of the public, it is not necessary to construe the policies under the mandate of the Interstate Commerce Act. Ample precedent supports this contention. *See, e.g., Carolina Casualty Insurance Co. v. Underwriters Insurance Co.,* 569 F.2d 304 (5th Cir. 1978); *Transport Indemnity Co. v. Rollins Leasing Corp.,* 14 Wash.App. 360, 541 P.2d 1226 (1975); *overruled on other grounds, Mission Ins. Co. v. Allendale Mutual Ins. Co.,* 95 Wash.2d 464, 626 P.2d 505 (1981); *Ryder Truck Lines, Inc. v. Carolina Casualty Insurance Co.,* Ind. 385 N.E.2d 449 (1979). *Argonaut Insurance Co. v. Transport Indemnity Co.,* 6 Cal.3d 496, 492 P.2d 673, 99 Cal.Rptr. 617 (1972). The reasoning which forms the basis for these cases is best stated in *Carolina Casualty Insurance Co. v. Underwriters Insurance Co., supra.* In that case, the Fifth Circuit refused to follow the Tenth Circuit's decision in *Argonaut Insurance Co. v. National Indemnity Co., supra,* stating as follows:

> The purpose of § 215 of the Interstate Commerce Act and regulations is to assure to members of the public and shippers that a certificated carrier has independent financial responsibility, ... to pay for losses created by its carrier operations. On the face of the endorsement this is accomplished by reading out "other insurance," "excess," or similar clauses insofar as the amount available to a third party victim would be reduced. But there is no need for or purpose to be

served by this supposed automatic extinguishment of the clause insofar as it affects the insured or other insurers who clamor for part or all of the coverage
. . . .

\* \* \* \* \* \*

Therefore, assuming without deciding that the Underwriters policy contains an ICC endorsement, we hold that the endorsement does not make Underwriters the primary insurer as a matter of law. . . . Carolina cannot disavow its primary insurer status on the theory that public policy demands that this be pushed off onto Underwriters. ICC policy factors are frequently determinative where protection of a member of the public or a shipper is at stake, but those factors cannot be invoked by another insurance company which has contracted to insure a specific risk and which needs no equivalent protection.

569 F.2d at 312–13 (citations and footnotes omitted).

## THE BASIS OF DECISION

Faced with these two conflicting but well-reasoned lines of authority,[9] the trial court evidently [10] adopted the view of the Fifth Circuit (*see Carolina Casualty Ins. Co. v. Underwriters Insurance Co., supra*) and concluded that the excess-other insurance clause in the Transport policy was not voided by federal law. Adopting this view, in a dispute where the rights of the shipper and the public are not involved, the terms of Transport's policy would be unaffected by federal law. As a result, both the Transport and Carolina excess clauses would apply and we would be faced with a loss covered by two excess carriers. Under such circumstances, the law generally holds that

where both insurers attempt to limit their liability to excess coverages, "the clauses are irreconcilable, cancel each other out, and the liability is to be divided equally between them." *Carolina Casualty Insurance Co. v. Underwriters Insurance Co.,* 569 F.2d at 315, quoting *State Farm Fire and Casualty Co. v. Holton,* 131 Ga.App. 247, 205 S.E.2d 872, 874 (1974); *see also Harbor Insurance Co. v. United Services Automobile Ass'n.,* 114 Ariz. 58, 559 P.2d 178 (App.1976). Indeed, each of the policies provides that in such situations an insurer will pay the loss on a dollar-for-dollar basis with any other applicable excess insurer whose policy contains a similar proration clause. Accordingly, the court below ruled that both Transport and Carolina were "primarily liable" and were "equally and jointly responsible" to pay any judgment "to the extent of the respective limits, dollar-for-dollar."

■ Although this legal conclusion may be in accord with what appears to be the trend of the majority of cases, our analysis leads us to the opposite result. We conclude that the Transport policy provides primary coverage for the accident, while Carolina's is only excess. We reach this result for three reasons.

1. *Analysis of the cases relied upon by Transport*

Some of the cases on which Transport relies and which appear to support the result below—that both insurers are primarily liable—are inapposite. For instance, in *Truck Insurance Exchange v. Transport Indemnity Co.,* 180 Mont. 419, 591 P.2d 188 (1979), the Montana Supreme Court held that both the lessors' and lessees' insurers were primary. Unlike Carolina's policy here, however, the lessor's policy in the

---

**9.** No doubt the court was also mindful of the general rule embodied in Arizona statute (A.R.S. § 28–1170.01, and also for some reason set forth in haec verba in A.R.S. § 20–1123.01) that where there is both owner's and non-owner's coverage available, the owner's coverage is primary. The Arizona statute went into effect in 1978, while the accident occurred in 1977. The law appears to be that Carolina's Truckmen's Endorsement reversed the ordinary re-

sult—that the owner's policy is primary. *Cf. Transport Indemnity Company v. Home Indemnity Company,* 535 F.2d 232 (3d Cir. 1976), and cases cited therein with *Dairyland Mutual Insurance Company v. Andersen,* 102 Ariz. 515, 433 P.2d 963 (1967).

**10.** The specific reasons for the holding were not set out in the minute entry order granting the motion for summary judgment.

Montana case contained language to the effect that it was "primary" coverage, *id.* at 422, 591 P.2d at 190, and that liability "shall not be reduced by the existence of . . . other insurance." *Id.* at 431, 591 P.2d at 195. Based on these provisions, the Montana court found that the lessors' insurer had agreed to provide primary coverage and ruled that "both insurers have obligated themselves to provide primary coverage . . . [which should be] prorated between them . . . ." *Id.* Thus the court also held that the Transport policy[11] provided primary coverage.

In *Carolina Casualty v. Insurance Company of North America,* 595 F.2d 128 (3d Cir. 1979), the Third Circuit held that "nothing in the federal motor carrier requirements, . . . or the imputed ICC endorsement . . . [to the lessee's policy] would alter any party's rights or duties of contribution." *Id.* at 143. However, since the jury in the underlying tort action had found the driver not negligent and the lessee and lessor each jointly liable for their independent tortious acts, the issue before the court was whether the lessee's insurer covered the lessor for its independent liability. The court held that neither the federal statute, the ICC regulations, nor the ICC endorsement precluded the lessee and its insurer from pursuing the right of contribution between joint tortfeasors nor absolved Carolina from covering its insured, the lessor, for state-imposed liability for the contribution due from an independently negligent joint tortfeasor. *Id.* at 144. So far as the record in this case discloses, however, there is no evidence that Powell, the lessor, was independently negligent.

Again, in one of the leading state court cases, *Transport Indemnity Co. v. Rollins Leasing Corp.,* 14 Wash.App. 360, 541 P.2d 1226 (1975), the Washington Court of Appeals held that Transport and the lessor's insurer, INA, were both excess carriers and prorated the loss between them. However, in reaching that result, the Washington

court noted that the lessor had agreed to provide the lessee with liability insurance for the trip lease and that the INA policy covering the lessor and describing the leased vehicle was "expressly 'made a part' of the rental agreement." *Id.* at 362, 541 P.2d at 1228. In essence, therefore, the court refused to accept INA's argument that the ICC endorsement made Transport the primary insurer irrespective of any contrary *agreement* between INA and its insured, the lessor. *Id.* at 364–65, 541 P.2d 1226. In the case before us, however, Carolina has not agreed to provide primary coverage; its Truckmen's Endorsement explicitly limits Carolina to excess coverage.

■ In a previous battle between these same insurers, the court held that the Carolina policy covering the lessor was primary and Transport's policy covering the lessee was excess. *Carolina Casualty Insurance Co. v. Transport Indemnity Co.,* 488 F.2d 790 (10th Cir. 1973). The court noted, however, that there were ICC endorsements to each policy and predicated its decision on an attempt to avoid circuity of action on the subrogation claims which Transport might assert. Such claims are not possible here, since it is conceded that each policy covers all of the possible defendants in the tort action and it is the rule that an insurer cannot subrogate against its own insured to assert the claim of its named insured. *See Carolina Casualty Insurance Co. v. Underwriters Insurance Co.,* 569 F.2d 304 (5th Cir. 1978).

### 2. The language of the policies

Nevertheless, a number of the cases support Transport's argument that neither federal law nor the ICC endorsement void the excess-other insurance clause of the Transport policy. The rationale of this view is that the effect of federal law is limited to disputes between the lessee and shippers or injured members of the public, so that the insurers are free between themselves to

11. The Montana court was evidently dealing with the same form of Transport policy as is    before us in the case at bench.

contract for allocation of the risk and "are left with their contracts, as they themselves have made them." *Rollins,* 14 Wash.App. at 366, 541 P.2d at 1230. Under this view, the determination of primary and excess coverage is to be based entirely on the terms and provisions of the policies themselves. Even if we were to accept this view of the law, we would still disagree with Transport's ultimate conclusion that it is an excess insurer for the accident in question.

Adopting, *arguendo,* the proposition that the status of the insurers is to be determined by the provisions of the policies, we must still acknowledge that at the most the Carolina policy extends only excess coverage for any accident which occurs while the described vehicle is leased to a common carrier. This is the very reason, in fact, for the insertion of the "Truckmen's Endorsement." *Transport Indemnity Co. v. Home Indemnity Co.,* 535 F.2d 232, 238 (3d Cir. 1976); *Allstate Insurance Co. v. General Fire and Casualty Co.,* 348 F.Supp. 682, 685 (E.D.Pa.1972). On the other hand, the Transport policy contains an endorsement providing that the body of the policy (which contains the excess-other insurance clause) "is hereby amended" so that ". . . no condition, provision, stipulation, or limitation contained in the policy . . . shall relieve [Transport] from liability hereunder or from payment of any . . . final judgment . . . ." If Transport's excess clause were applied, Carolina would be liable for all or part of the loss;[12] the excess-other insurance clause of Transport's policy would thus have been used to "relieve [Transport] from liability hereunder or from payment of any . . . final judgment"[13] despite the fact that such a result is expressly prohibited by the endorsement physically attached to Transport's policy.

Most of the courts which have reached the conclusion that the two insurers are co-primary or co-excess have not considered this inconsistency in their logic. When the issue was considered in a case in which the lessor's insurer was admittedly primary, the Montana court first refused to adopt the argument that federal law required a holding that Transport was *the* primary insurer. However, the court could not disregard the provisions of the ICC endorsement which, as here, was attached to and formed part of the Transport policy; thus, the court went on to hold as follows:

> [T]he I.C.C. endorsement attached to the Transport Indemnity Co. policy specifies that "no condition, provision, stipulation or limitation contained in the policy shall relieve the Company from liability hereunder." Thus, the excess coverage clause, at least up to the limits of liability specified in the I.C.C. endorsement, is negated and ineffective to relieve Transport Indemnity Co. from primary coverage.

*Truck Insurance Exchange v. Transport Indemnity Co.,* 180 Mont. at 432, 591 P.2d at 195.

We agree with this analysis. Even if we were to hold that federal law does not alone determine the rights of the insurers, we cannot read out of the Transport policy a provision which is in that policy. The fact that federal law imputes that provision when the policy is certified does not allow us to conclude that it is written in special ink which appears for cases involving the public and disappears in cases involving other insurers. Here, the clause is physically attached to the policy and must be given effect. We believe that the effect of the ICC endorsement as a part of the Transport policy has been best stated in the minority opinion of the California Supreme Court:

---

**12.** If Carolina were a primary insurer and Transport an excess insurer, Transport would escape liability entirely, unless the loss exceeded Carolina's limits. If both insurers were excess, the loss would be prorated and Transport would be relieved in part.

**13.** We have previously held that an excess clause has such an effect. *See Rocky Mountain Fire & Casualty Co. v. Allstate Insurance Co.,* 107 Ariz. 227, 230, 485 P.2d 552, 555 (1971), holding that an excess clause in a "garageman's policy" had the effect of relieving

Our inquiry must be directed to the legal effect of the required endorsement [14] on the provisions of the original policy with which the P.U.C. has no concern. This is a problem of construction of contracts, for even though the endorsement was required by law, such instrument should be interpreted as a contract, not as a statute. . . .

. . . [T]he P.U.C. endorsement attached here specifically provides that "no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon . . . shall relieve [Transport] from liability hereunder . . . ." The "excess" clause in the standard agreement is clearly a "condition" or "provision" which might, in the absence of the endorsement, relieve Transport from liability. The above language of the endorsement is plain and forthright. It speaks in broad, unconditional and absolute terms: "*no* condition [or] provision . . . in the policy . . . *shall relieve* [Transport] from liability . . . ." . . . The endorsement thus has the effect of superseding and nullifying the "excess" clause which might otherwise relieve Transport from liability. By so doing, it has transformed the coverage into "primary" coverage. Transport of course was fully aware that such an endorsement was required to be affixed to any automobile policy of Willig as a condition to the issuance of a P.U.C. permit and therefor must be presumed to have assented to the sweeping effect of its language.
*Argonaut Insurance Co. v. Transport Indemnity Co.,* 6 Cal.3d at 511, 492 P.2d at 682, 99 Cal.Rptr. at 626 (Sullivan, J., dissenting).

Thus, even if we adopt Transport's argument that the rights of the insurers must be determined by the words of the policy, we hold that the words of the endorsement must be considered simply because they are part of that policy. The effect of the ex-

cess-other insurance clause in the body of the Transport policy is to relieve Transport of liability, contrary to the provisions of the ICC endorsement. The endorsement expressly amends the body of the policy so that the provisions of the endorsement govern. Based on the language of the policy, we must conclude further that the provisions of the endorsement nullify the excess-other insurance clause in the body of the policy. Therefore, simply considering the respective policy provisions, Transport provides coverage for the accident as a primary insurer, while Carolina expressly provides only excess coverage.

### 3. *The effect of federal law*

If the endorsement were not present and we were compelled to decide the issue of primary coverage on our interpretation of the Interstate Commerce Act, we would reach the same result. Transport urges that the reasoning set forth by the Washington, Montana and California courts in *Rollins, supra, Truck Insurance Exchange v. Transport, supra,* and *Argonaut* (California version), *supra,* compels us to find that the requirements of law are to be applied only in disputes between the insurer and the injured public, and has no relevancy to a dispute between insurers seeking to apportion the loss. Again, we recognize that the cases cited above so hold and form a probable majority. Respectfully, we disagree. We believe these cases fail to give proper scope and recognition to the purposes for which the statute was enacted and the regulations promulgated. The intent of Congress was not just to provide assurance that the claims of shippers and injured members of the public would ultimately be paid. The intent was to permit the ICC to abolish and regulate a wide range of practices which had come into existence in the trucking industry "by imposing 'responsibility-and-control' regulations governing the regulation of non-owned vehicles." *Carolina Cas-*

the insurer from liability in derogation of the Arizona Financial Responsibility Law.

**14.** The endorsement in question was required by the California Public Utilities Commission.

The California statute, regulations and endorsement are set forth in the case and are substantially identical to the federal law, regulations and endorsement.

*ualty Insurance Co. v. INA,* 595 F.2d at 137, quoting *American Trucking Association v. United States,* 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953). Indeed, the list of abuses, including the evasion of financial responsibility through use of trip leases, covers several pages of the reporter. *See American Trucking Association,* 344 U.S. at 303–11, 73 S.Ct. at 311–15. In a later case, the Supreme Court stated that "fixing financial responsibility for damage and injuries to shippers and ... the public were the significant aims and guideposts in the development of the comprehensive rules." *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.,* 423 U.S. 28, 37, 96 S.Ct. 229, 233, 46 L.Ed.2d 169 (1975).

Congressional intent included "fixing" financial responsibility by adopting a rule of law making the lessee liable for any negligent act of the driver, even though he was employed by the lessor. It included adoption of requirements that the lessee give proof of financial responsibility for its liability for the acts of the driver. It included language preventing the insurer whose policy was filed as proof of financial responsibility (Transport in this case) from relieving itself of its obligation to pay damages. *Transamerican Freight Lines, Inc. v. Brada Miller, supra.*

Thus, we disagree with the concept that all loss allocations between private parties are permissible so long as they do not directly prevent compensation to the public. In some cases private agreements respecting loss allocation do not significantly intrude in the federal regulatory scheme and are permissible. *See Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc., supra,* upholding the validity of an indemnification agreement between the lessor and lessee. However, in all cases the federal policy must be considered paramount and affects the interpretation and construction to be given the contractual agreements. We believe here that federal policy does affect the determination of primary and excess status between carriers regardless of the presence or absence of the ICC clause physically attached to the policy.

First, given the fact that the congressional act imposes direct liability on the lessee and given further that the lessee's insurance policy is proof of the lessee's financial responsibility for that very liability, we believe that the purposes which Congress and the ICC intended to accomplish in regulating the trip lease problem are better served if the lessee's insurance is considered "responsible for primary coverage, both as a matter of law and of public policy." *Allstate Insurance Co. v. Federal Insurance Co.,* 23 Md.App. 105, 118–19, 326 A.2d 29, 37 (1974), *modified,* 275 Md. 460, 341 A.2d 399 (1975); *Aetna Casualty and Surety Co. v. Arkin,* 365 F.Supp. 813, 817 (N.D.Ill.1973); *Allstate Insurance Co. v. General Fire & Casualty Co.,* 348 F.Supp. 682, 685 (E.D.Pa. 1972). We believe that any other conclusion would detract from the policy of fixing liability and financial responsibility. The majority of the California court refused to adopt this conclusion because they feared it would result in imposing primary liability upon the lessee's insurer "in all cases simply because the trucking industry is more highly regulated ...." *Argonaut Insurance Co. v. Transport Indemnity Co.,* 6 Cal.3d at 506, 492 P.2d at 678, 99 Cal.Rptr. at 622. However, we agree with the minority of the California court that this is exactly the point. "It is fully consistent with the purposes of regulating common carriers to insist that they [and their insurers that have certified the motor carrier's financial responsibility] bear a greater financial responsibility ..." than the other parties involved. *Id.* at 512, 492 P.2d at 682, 99 Cal.Rptr. at 626.

Second, requiring primary coverage from the lessee's carrier has the salutary effect of establishing a uniform rule fixing primary financial responsibility for defense and payment of claims in all cases involving trip leases. We believe this result to be consonant with and required by the objectives which Congress intended to achieve by enactment of the Interstate Commerce Act. It has the further beneficial effect of aiding in the disposition of claims without delays resulting from the necessity of protracted litigation between the insurers in order to

determine which of them is to provide primary coverage and which excess coverage. We believe that this, also, more closely promotes or accomplishes the objectives intended by Congress. We do not go so far as to hold that federal law imposes upon the lessee's insurer the status of sole primary insurer. There may be other primary insurers, depending upon the terms of the lessor's insurance contract. *See Truck Insurance Exchange v. Transport Indemnity, supra.* And there may be indemnification agreements between lessor, lessee and other respective insurers. *See Transamerican Freight Lines, Inc. v. Brada Miller, supra.* Where they exist, these rights may be enforced by action for contribution or indemnity, but such actions will not ordinarily delay disposition of the tort claim by enforcement of the primary liability which the lessee and its insurer must bear.

■ We hold, therefore, that whether the ICC endorsement is physically attached to the policy or merely imputed by law, the lessee's carrier provides primary coverage to the minimum limits required by law.

### THE EFFECT OF THE SELF-INSURANCE PROVISION

■ This brings us to the final problem in this complex case. The Transport policy which was certified as proof of ICX's financial responsibility is written with a retention or self-insurance provision of $50,000. This means that as between ICX and Transport the first $50,000 of each loss is to be paid by ICX. Transport argues, therefore, that even if its underlying policy is held primary the Carolina policy must be applied to cover ICX for the first $50,000 of the loss, that being the amount of ICX's self insurance. No authority is cited for this proposition, and we have found none. We disagree with the contention.

ICX is permitted to enter into agreements with its carrier for allocation between them regarding the payment of any loss. Presumably ICX bargained for this arrangement and got the reduced premium it bargained for. The clear intention of the Carolina policy is to insure only in excess of the minimum limits required by the ICC (which are $100,000). If the first part of the Truckmen's Endorsement has any meaning, it would appear to negate any coverage by Carolina of the lessee's retention.

In *Ryder Truck Lines, Inc. v. Carolina Casualty Insurance,* Ind.App., 372 N.E.2d 504 (1978), *rev'd on other grounds,* Ind., 385 N.E.2d 449 (1979), the Indiana Court of Appeals stated:

> Appellants argue that as there is no "valid and collectible" insurance up to the $25,000 deductible amount, Carolina's "excess insurance" clause comes into play.
>
> We cannot agree with this assertion. The liability of an insurer under an "excess insurance" clause arises only after the limits of the primary policy are exhausted. See generally 8 Appleman, *Insurance Law & Practice* § 4914. In the present case, Carolina's excess coverage began, as the plain words of the policy provide, only if the loss was *over* the $100,000 limit in the Liberty Mutual policy for personal injury liability. Thus the "excess" liability contemplated focuses on the upper limits of the other insurance policy. The deductible provision does not affect this construction of Carolina's "excess insurance" clause. This result is consistent with the intentions of the parties. Where an insured purchases a liability policy with a deductible provision, the reduction in coverage results in lower premiums. Up to the deductible amount the expectation is that he will be a "self-insurer." At the same time the excess insurer, contemplating the possibility that other insurance exists to cover the same risk, limits its liability to amounts over and above that coverage. In such a situation the excess insurance clause should not be extended to cover an amount for which the insured, here Ryder, has bargained to become a "self-insurer." *Id.* at 372 N.E.2d at 511.

We hold, therefore, that the Transport policy provides primary coverage to the extent of $100,000, that the payment of the retention or deductible portion of the loss is

a matter of contract between Transport and ICX, and that the Carolina policy issued to Powell does not cover ICX for that retention.

We were informed at oral argument that the tort claim had been settled for an amount within the minimum ICC limits covered by the Transport policy. The record does not reveal the amount of the settlement nor by whom it was paid. Consequently, we have no way of determining who, if anyone, is entitled to reimbursement, or, if appropriate, the amount of such reimbursement. Accordingly, the judgment is reversed and the case remanded to the superior court for determination of those issues in light of the legal principles announced in this opinion.

HOLOHAN, C.J., and CAMERON, J., concur.