701 P.2d 575

Rita A. WILSON, individually and as statutory trustee, Plaintiff/Appellee,

v.

RILEY WHITTLE, INC., a Kentucky corporation, and Herman Robert Meyer, Defendants/Appellants.

No. 2 CA–CIV 5110.

Court of Appeals of Arizona, Division 2.

Dec. 20, 1984.

Review Denied April 2, 1985.

Miller & Pitt, P.C. by John L. Tully and Richard L. McAnally, Tucson, for plaintiff/appellee.

Jack M. Anderson, John S. Schaper, Phoenix, for defendant/appellant Riley Whittle, Inc.

Jennings, Strouss & Salmon by W. Michael Flood and Jefferson L. Lankford, Phoenix, for defendant/appellant Meyer.

## OPINION

HOWARD, Judge.

This is a wrongful death action brought by Rita Wilson for the death of her husband, Lonnie Wilson, who died as a result of a two-truck collision in Phoenix. The case was tried to a jury, which rendered a verdict in favor of appellee and against appellants Riley Whittle, Inc. and Herman Meyer in the amount of $1,010,000 compensatory damages. The jury also awarded appellee $10,000 punitive damages against Meyer and $350,000 punitive damages against Riley Whittle.

The evidence considered in the light most favorable to supporting the verdict is as follows. Riley Whittle, Inc. is an interstate trucking company that transports goods for other companies. It has its own staff of truck drivers and owns its own vehicles, but occasionally finds it necessary to hire independent truckers and lease their vehicles to transport particular shipments. When Riley Whittle enters into such an arrangement with an independent trucker, it is required by federal law to sign a written trip lease with the trucker and to inspect his truck.

At the time of the accident, Herman Meyer was an independent trucker who lived in Sahuarita, Arizona. He earned his living by leasing his truck and his services as a driver to various companies. In November 1981, Riley Whittle was contacted by A.J. Bayless, which had a shipment of cranberry juice that needed to be transported from Yuba City, California to Phoenix, Arizona. Meyer had just transported a shipment to California for another company and was looking for a run which would bring him back to Arizona. He placed a telephone call to Riley Whittle and talked to James Adams, one of the dispatchers employed by Riley Whittle. Adams assigned the Bayless load to Meyer and told him to have a trip lease signed for the load. He then instructed him to pick up the load, giving him the information as to where the load was located, where it was to be delivered and the delivery time.

After the telephone conversation, Meyer did not go to have a trip lease signed. Instead, he went directly to the Bayless depot, picked up the load for Riley Whittle and called Adams to confirm the pickup. Adams knew that Meyer was en route with the shipment for Riley Whittle.

While transporting the shipment, Meyer's truck broke down in Barstow, California. He called Adams and indicated he would need funds in order to repair the truck and complete the delivery. Adams sent $600 to Meyer so the Meyer truck could be repaired. After leaving Barstow on Friday, December 3, Meyer drove for several hours and then stopped for dinner in California. He purchased some beer with the intent of drinking the beer when he stopped for the evening. He was in no hurry to get to Phoenix, since he knew that he could not deliver the cranberry juice to Bayless until Monday, December 6. He planned to drive to Phoenix on Saturday morning and spend Saturday and Sunday at the Riley Whittle yard.

Meyer arrived in Parker, Arizona, at approximately 9:00 p.m., December 3. He was tired and decided to stop for the night. He pulled his rig off the road, got into his sleeper berth, and drank the beer. Meyer did not turn off the engine because he had a dead battery cell, and if he turned his engine off he would not be able to start the rig in the morning. His engine started to overheat due to a leak in the cooling system. Knowing that there was a truckstop that was open in Quartzite, Arizona, he decided to drive there, a distance of approximately 15 or 20 miles, in order to repair the leak.

After arriving at the truckstop in Quartzite, Meyer repaired the leak and refilled the radiator with water. He decided not to remain in Quartzite for the evening but instead decided to drive to Riley Whittle's yard in Phoenix. Meyer had never been to Riley Whittle's yard, and when he arrived on the western outskirts of Phoenix, he called Riley Whittle's dispatcher and was told that the yard was located north of the intersection of 83rd Avenue and Buckeye Road.

Meyer arrived at the intersection shortly before 3:00 a.m. on December 4. He pulled his rig into the parking lot of Cowboy Bob's tavern. The tavern was located on the south side of Buckeye Road, approximately 300 feet east of the intersection.

He parked his rig facing in an easterly direction and went into the bar. Meyer asked the bartender for a beer and for directions to Riley Whittle's yard. The bartender told him that it was after hours and that he could not be served any beer. The bartender was unfamiliar with the location of the yard and directed Meyer to a public telephone located inside the tavern. Meyer called the dispatcher at Riley Whittle and got directions to the yard. In order to reach Riley Whittle's yard he would have to make a U-turn, go west on Buckeye Road, then turn north on 83rd Avenue.

Meyer left the tavern, got into his truck and started to leave the parking lot. He stopped at the south edge of Buckeye Road, and when he looked to the west he saw an eastbound truck approaching him on Buckeye. Meyer believed, however, that the truck was far enough down the road that he would have time to complete his U-turn and clear the eastbound lanes of travel. Meyer started to make his U-turn on Buckeye Road. At the same time, Lonnie Wilson was approaching from the west. Wilson was driving an eighteen-wheel tractor-trailer unit east on Buckeye Road at a speed of approximately 45 or 50 m.p.h. The speed limit for eastbound traffic on Buckeye was 55 m.p.h. Wilson's truck hit the center of Meyer's trailer at approximately a 90-degree angle. The accident occurred on the outside eastbound lane of Buckeye Road. At the time of the accident, Meyer's tractor-trailer was blocking both eastbound lanes of Buckeye as well as the inside westbound lane. Wilson was killed instantly.

While Meyer testified that he drank only three beers in Parker, an intoxilyzer test showed that he had a blood alcohol level of .11 at the time of the test and a minimum blood alcohol level of .13 at the time of the accident. In order to have reached such a blood alcohol level at the time of the accident, Meyer would have to consume ten 12-ounce cans of beer prior to the accident.

Meyer's defense in the trial court was that he was not intoxicated at the time of the accident. He also put on evidence from

an accident expert suggesting that Lonnie Wilson was guilty of contributory negligence in failing to keep a proper lookout. The trial court instructed the jury on the issues of both gross negligence and contributory negligence.

The determinative issue in this case concerns the trial court's instruction on gross negligence, which was given over appellants' objection. It states:

"Driving under the influence of alcohol *is gross negligence.* If you find that Defendant Meyer was under the influence of alcohol when the accident occurred, and that Defendant Meyer's condition was a proximate cause of the accident, then you *must* find that the Defendant Meyer was guilty of gross negligence." (Emphasis added)

The trial court then instructed the jury that contributory negligence is not a defense to gross negligence. We hold that the trial court's instruction constituted reversible error.

■ Our case of *Starr v. Campos,* 134 Ariz. 254, 655 P.2d 794 (App.1982), makes clear that when there is evidence of drunk driving, the issue of gross negligence is to be decided by the jury and not the trial court:

"... If there is evidence that the defendant was driving while intoxicated, and that his intoxicated driving was a proximate cause of an accident and resulting injury, *the jury must decide whether that negligence was gross or wanton.*" (Emphasis added) 134 Ariz. at 256, 655 P.2d 794.

This is in accord with the rule that evidence of intoxication is a circumstance to be considered in determining whether or not a driver is guilty of gross negligence. See *McIntosh v. Lawrance,* 255 Or. 569, 469 P.2d 628 (1970); *Carley v. Meinke,* 181 Neb. 648, 150 N.W.2d 256 (1967); *Meade v. Meade,* 206 Va. 823, 147 S.E.2d 171 (1966); but see, *Budiselich v. Rigsby,* 639 S.W.2d 663 (Tenn.App.1982) (drunk driving is an action malum in se and constitutes gross negligence).

■ Appellee argues that even if the instruction was theoretically incorrect, it was correctly given under the facts of this case because no reasonable man could come to any other conclusion. We do not agree. A trial court may direct a verdict in favor of one party only when no evidence is introduced which would justify a reasonable man in returning a verdict for the opposing party. *Smith v. Chapman,* 115 Ariz. 211, 564 P.2d 900 (1977). We do not believe that is the state of the evidence here. Despite the readings of the intoximeter, the bartender at Cowboy Bob's, the one person who saw Meyer just prior to the accident, testified that there was nothing in his conversation with Meyer that indicated to him that Meyer had been drinking. He also saw Meyer immediately after the accident and did not observe anything that indicated that Meyer had been drinking or was under the influence of alcohol. Furthermore, the evidence showed that Meyer had traveled from Parker to Phoenix, a distance of at least 150 miles, without incident. The effect of the intoxicants on the degree of negligence was a jury question here.

In view of our disposition of this case, we shall address only those issues which may recur at a retrial of this case.

Appellant Riley Whittle contends that the trial court erred in granting partial summary judgment on the issue of its vicarious liability by holding that Riley Whittle would be liable for the negligence of Meyer. It contends that this was error, since there was a jury question as to whether or not there was a valid contractual lease arrangement between Meyer and Riley Whittle under the federal law. More specifically, Riley Whittle contends that the signing of the trip lease was a condition precedent to any contractual liability on its part. We do not agree.

In the 1950s, it was common practice for trucking companies to attempt to immunize themselves from liability by using independent truck drivers or by denominating the regular drivers as independent contractors. To combat this practice and to ensure that

the motoring public was adequately protected, Congress enacted 49 U.S.C. § 11107 (formerly 49 U.S.C. § 304(e)). See *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.*, 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975). The federal statute and the regulations promulgated thereunder protect the motoring public by requiring the trucking company to have control of and to be responsible for the operation of leased vehicles. The trucking company is required to enter into a trip lease with the truckdriver, to inspect the lease vehicle, and to provide insurance coverage on any lease vehicle. 49 U.S.C. § 11107; 49 C.F.R. § 1057.

 The purpose of the regulations is stated in *Transport Indemnity Company v. Carolina Casualty Insurance Company*, 133 Ariz. 395, 652 P.2d 134 (1982):

"Congress intended to put the use and operation of leased equipment on a parity with the use of equipment owned by the authorized carrier and operated by its own employees, in effect making the driver of the leased unit a statutory employee of the lessee." 133 Ariz. at 397.

Federal law creates an irrebuttable presumption that the lessor is the employee of the motor carrier. *Mellon National Bank & Trust Company v. Sophie Lines, Inc.*, 289 F.2d 473 (3rd Cir.1961). Under the Federal statutes and regulations the liability of the trucking company is no greater than that which exists under the doctrine of respondeat superior. *Wilcox v. Transamerica Freight Lines*, 371 F.2d 403 (6th Cir.1967), *cert. den.*, 387 U.S. 931, 87 S.Ct. 2053, 18 L.Ed.2d 992.

The cases are uniform in holding that the absence of a written trip lease is legally irrelevant. In *Cox v. Bond Transportation, Inc.*, 53 N.J. 186, 249 A.2d 579 (1969), *cert. den.*, 395 U.S. 935, 89 S.Ct. 1999, 23 L.Ed.2d 450, the court stated:

"The regulations described above have the force and effect of law. A franchised interstate carrier cannot evade them by making an oral or written lease with an owner-operator of equipment for a trip, for a day or for an indefinite

period, which attempts to exclude or to limit their application. When such a carrier engages an owner-operator of a tractor intending to have him transport goods for it on the public highways and interstate commerce ... the regulations must be deemed included in their contract." 249 A.2d at 586–87.

In *Ronish v. St. Louis*, 621 F.2d 949 (9th Cir.1980), the lessee of a vehicle involved in a collision sought indemnity from the driver lessor. Evidence introduced at trial proved that the parties had failed to execute a written trip lease. The court found that the absence of a written trip lease was immaterial since:

"[The lessee's] liability is not premised on the traditional employer-employee relationship; rather [the lessee] is liable as a matter of federal law...." 621 F.2d at 951.

 In this case, the absence of a written trip lease is legally irrelevant. Riley Whittle engaged Meyer to haul a Bayless load from Yuba City to Phoenix. Riley Whittle knew at all times that Meyer had picked up the load, as well as Meyer's location during the transportation process. The accident occurred while Meyer was in the act of transporting that load to Riley Whittle's yard in Phoenix. At least part of the reason for Meyer's failure to sign a trip lease rests on the shoulders of Riley Whittle due to its loose internal procedures which allowed Meyer to pick up the load without presenting a signed trip lease. The public policy expressed by 49 U.S.C. § 11107 and 49 C.F.R. § 1057 would be wrongfully frustrated if we were to allow Riley Whittle to evade the liability imposed upon it by the federal statute and regulations by asserting that a written trip lease was a condition precedent to any contract between the parties and to responsibility on its part. Instead, that policy demands a holding that Riley Whittle is liable as a matter of law.

Riley Whittle contends that when the liability of an employer is based solely on the doctrine of respondeat superior, the employer cannot be charged with a greater

amount of punitive damages than that imposed upon the employee. We do not agree.

A case on point is *Johnson v. Atlantic Coastline R. Co.*, 142 S.C. 125, 140 S.E. 443 (1927). There the jury rendered a verdict of $1,500 punitive damages against the master and $300 punitive damages against the servant in a case in which the master's liability was based solely on the doctrine of respondeat superior. The jury apportioned the compensatory damages in a similar fashion. The South Carolina Supreme Court held that compensatory damages could not be apportioned but that punitive damages could. The court pointed out that whereas actual compensatory damages relate to the situation of the injured party, punitive damages relate more to the situation of the defendants, one of the chief purposes being to punish the wrongdoer and to deter others from the same conduct. Furthermore, in the assessment of punitive damages, there is no exact monetary standard which can be used to measure them. It is entirely within the discretion of the jury, which should consider the character of the tort committed, the punishment which should be meted out, and the financial standing of the defendants.

The South Carolina court also considered the fact that in some situations the servant will end up being punished more severely for the tort than the corporate master since the servant may be subject to criminal punishment, as was the case here with Meyer, while the corporate master may be required to do nothing more than pay out money. In such instances, the corporate master should be required, in the only way in which the law can reach it, to be made to suffer punishment sufficient to meet the offense.

▮▮▮▮ Arizona law is similar to that of South Carolina. Like South Carolina, we allow punitive damages against the corporate employer for the acts of an employee under the doctrine of respondeat superior. See *Western Coach Corporation v. Vaughn*, 9 Ariz.App. 336, 452 P.2d 117 (1969). Punitive damages are not to compensate the plaintiff, but rather to punish the defendant. *Nielson v. Flashberg*, 101 Ariz. 335, 419 P.2d 514 (1966). The rationale for awarding punitive damages would be subverted if we were to hold that the trier of fact must award the same amount against both the master and the servant. We hold that the trier of fact can award a higher amount of punitive damages against the master than the amount awarded against the servant.

Over Riley Whittle's objection, the following instruction was given to the jury:

"The law of this state allows you to award punitive damages against the corporation for the wrongful acts of its employees. Punitive damages are allowed against a corporation because the acts of an agent are the acts of the corporation and because it is believed that such damages will encourage employers to exercise closer control over their agents, thereby preventing outrageous or reckless conduct. If you decide to award punitive damages against Riley Whittle, you may consider Riley Whittle's financial condition in deciding the appropriate amount of damages."

We shall confine our discussion to the only objection that was made below and not to later theories raised by Riley Whittle on appeal. Riley Whittle's objection below was as follows:

"... It is a matter of law that [in view of] the state of the evidence in this case, the jury cannot assess punitive damages against Riley Whittle to demonstrate or encourage employers such as Riley Whittle to exercise closer control over their agents.

As lines 6 and 7 reflect on the said Instruction No. 26 as a matter of law in this case, Riley Whittle had absolutely no control or right to control the activities of Herman Meyer during the consumption of any beer at or near Parker, Arizona.

The only way Riley Whittle as a matter of law could have exercised any control over Mr. Meyer was to employ someone to ride shotgun on Mr. Meyer and to be

in his presence at all times when he was on duty or off duty."

Since Riley Whittle is liable only under the doctrine of respondeat superior and only because of the federal statute and regulations, it contends that the instruction is inapplicable to the present situation. We do not agree.

In *State v. Sanchez*, 119 Ariz. 64, 579 P.2d 568 (App.1978) we stated:

"The reason for allowing punitive damages against the corporation is the supposed deterrent effect. The allowance of such damages will encourage employers to exercise close control over their servants for the prevention of outrageous torts." 119 Ariz. at 66, 579 P.2d 568.

Riley Whittle's contention that it had absolutely no control over Meyer's conduct is totally erroneous. The purpose of 49 U.S.C. § 11107 and the regulations promulgated thereunder was to make a trucking company such as Riley Whittle responsible for and in control of the operation of leased vehicles. *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.*, supra. Riley Whittle's argument is without merit.

Appellant Meyer raises three further issues. He first contends that the trial court erred in admitting, over his objection, the fact that he had been convicted of negligent homicide. The trial court admitted the conviction and instructed the jury that it could use the conviction only for the purpose of discrediting Meyer's testimony. He contends that since this conviction was based upon a nolo contendere plea, the trial court erred in its admission. He bases this contention on Rule 410, Rules of Evidence, 17A A.R.S. Rule 410 provides:

"Except as otherwise provided by applicable Act of Congress, Arizona statute, or the Arizona Rules of Criminal Procedure, evidence of a plea of guilty, later withdrawn, or *a plea of nolo contendere or no contest,* or an offer to plead guilty, nolo contendere or no contest to the crime charged or any other crime, or of statements made in connection with any of the foregoing pleas or offers is not admissible against the person who made the plea or offer in any civil or criminal action or administrative proceeding." (Emphasis added)

The evidence of the conviction was admitted here under Rule 609, which allows, for the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime. The difference between admitting into evidence a plea of nolo contendere and a conviction based on a plea of nolo contendere was discussed in the case of *United States v. Williams*, 642 F.2d 136 (5th Cir.1981). The Court first observed that in the 1971 draft of Rule 609(a) convictions based upon a plea of nolo contendere were specifically omitted from the operation of the rule. Under the 1971 draft such convictions could not be used for impeachment purposes. However, this exception for nolo contendere convictions was deleted in the rules which were adopted by the Supreme Court in 1972 and does not appear in the rule enacted by Congress. The inference to be drawn from this is that Congress did not intend a separate treatment for convictions based upon pleas of nolo contendere.

The Court noted that admitting a nolo conviction under Rule 609 is well founded, since the judgment entered on a plea of nolo contendere adjudicates guilt with the same finality and force as a judgment entered pursuant to a guilty plea or a conviction following trial. Furthermore, there is a distinct and meaningful difference between the evidentiary use of a plea to a criminal charge and a conviction of a criminal charge. As the Court stated in *Williams:*

"When a defendant is advised of the charge against him and asked to plead to it, his response that he is 'guilty' constitutes an admission. He has made a most solemn statement that he has acted as charged. If, on a subsequent occasion (perhaps in a civil action predicated on the acts charged in the criminal case), the same person denies having done those acts, he is subject to impeachment by his prior statement (plea of guilty) inconsistent with the later denial. A plea of 'not guilty' admits nothing; it is not inconsist-

ent with the later denial of the acts charged, even though he be convicted in the criminal case. (Whether or not the conviction could be used would depend upon the laws made and provided for the use of criminal convictions as evidence which may vary from jurisdiction to jurisdiction and from case to case.)

A plea of *nolo contendere* performs a specific function. As a statement of the defendant for which he may, in another proceeding or on another occasion be called upon to account, it admits nothing. It is the same as a plea of not guilty. However, in the criminal proceeding then pending, the plea of *nolo contendere* is taken as a complete admission of guilt leading to a judgment of conviction." (Emphasis in original) 642 F.2d at 139.

The *Williams* court made further observations on the nolo plea. Once one is convicted, it makes no difference as far as Rule 609 is concerned whether the conviction was based on a nolo contendere plea, a plea of guilty, or a plea of not guilty. Rule 609 creates no difference between convictions according to the pleas that preceded them. Rule 609(a) permits proof of the conviction, but the prosecution cannot show that appellant admitted his guilt by his plea. The purpose of the exclusion in Rule 410 of the nolo plea is the promotion of the disposition of criminal cases by compromise. Nolo pleas create a significant incentive for the defendant to terminate the pending litigation in order to avoid admitting guilt for subsequent litigation. Rule 609 is different. It governs the use of convictions for impeachment. Since a nolo plea is an admission of every element of the offense, a conviction based on such a plea is as conclusive for the purposes of Rule 609 as a conviction based on a guilty plea or verdict.[1]

■ As we observed in *State v. Cross*, 123 Ariz. 494, 600 P.2d 1126 (App.1979) Arizona has, with a few changes, adopted the new Federal Rules of Evidence. While there is a difference between our Rule 609(a) and Rule 609(a) of the Federal Rules of Evidence, that difference is irrelevant here, and, for all intents and purposes, our Rule 410 is essentially the same as Rule 410 of the Federal Rules of Evidence. We agree with *United States v. Williams*, supra, and hold that a conviction as a result of a plea of nolo contendere is admissible under Rule 609(a) of the Arizona Rules of Evidence.

■ Meyer contends that the use of his conviction for impeachment was erroneous, because the trial judge failed to conduct an inquiry on the record to determine whether the probative value of admitting the conviction outweighed its prejudicial effect and because the prejudice here clearly outweighed its probative value. Rule 609(a) of the Arizona Rules of Evidence provides, inter alia, that felony convictions are admissible if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect. This determination should be made only after the court has conducted a hearing on the record. *State v. Cross*, supra. After the hearing, it should explicitly find on the record that the probative value of admitting the evidence outweighs its prejudicial effect. *State v. Cross*, supra. That was done here by the trial judge. However, the trial court need not, as suggested by Meyer, make specific findings of fact upon which it bases its ultimate conclusion. *State v. Milburn*, 135 Ariz. 5, 658 P.2d 805 (App.1982), *approved in part, vacated in part*, 135 Ariz. 3, 658 P.2d 803 (1983). While the foregoing cases are criminal, the rules of evidence apply equally to civil cases as well as criminal cases. As far as prejudice is concerned, Arizona follows the rule that any felony conviction, even if it does not involve a false statement or dishonesty, has probative value on the issue of the witness' credibility. *State v. Aguirre*, 130 Ariz. 54, 633 P.2d 1047 (App.1981). The trial court is vested with broad discretion in deciding whether to admit evidence of a felony conviction for impeachment purposes. The tri-

---

1. Several law commentators support the proposition that a nolo conviction is admissible under Rule 609. See 10 Moore's Federal Practice § 609.12[2] (2nd ed. 1982 and Supp.1984); McCormick on Evidence § 43 at 96–97 (E. Cleary 3rd ed. 1984); 2 J. Weinstein and M. Berger, Weinstein's Evidence ¶ 410[01] (1982 and Supp.1984).

al court's ruling will not be disturbed in the absence of a clear showing that its discretion has been abused. *State v. Dixon*, 126 Ariz. 613, 617 P.2d 779 (App.1980).

However, the discretion of the trial court is not unlimited and great care must be taken to prevent the introduction of the conviction to operate as directing a verdict on an issue in the case. Here, the conviction was for negligent homicide. One of the issues in this case was whether Meyer was negligent. Even without there being any mention of the basis for the negligent homicide conviction, it would not take a genius to put two and two together and conclude that the negligent homicide conviction here was for the death of Lonnie Wilson. While it is true that Meyer's credibility was very much at issue, since he claimed he had only three beers to drink, the probative value of a negligent homicide conviction on his credibility, compared to the effect that this conviction would have on one of the issues in this case, was minimal. Appellees contend that its admission was not prejudicial and was in response to evidence elicited by Meyer's own counsel when he brought out the fact that Meyer had been arrested for drunk driving and his counsel had also secured the trial court's permission to introduce evidence that Meyer had been imprisoned as a result of the accident. Meyer responds by arguing that his conviction and imprisonment were admissible to mitigate punitive damages by showing that he already had been punished for the accident. Considering the prejudice of the introduction of the conviction for negligent homicide, it is immaterial whether it was offered because "the door had been opened" or as impeachment. See Rule 403, Rules of Evidence, 17A A.R.S. (Supp.1984) (exclusion of prejudicial evidence). We do not mean to hold here that the trial judge could not, within his discretion, allow appellees to impeach Meyer for the felony conviction without mentioning the fact that it was for negligent homicide.

Reversed.

BIRDSALL, C.J., and HATHAWAY, J., concur.