**JOHN B. BARBOUR TRUCKING COMPANY, et al., Appellants,**

v.

**The STATE of Texas, Appellee.**

**No. 3–87–206–CV.**

Court of Appeals of Texas, Austin.

Sept. 21, 1988.

Rehearing Denied Oct. 19, 1988.

Barbara J. Lipscomb, Brown, Maroney, Rose, Barber & Dye, Austin, for appellants.

Jim Mattox, Atty. Gen., Jerili R. Little, Asst. Atty. Gen., Austin, for appellee.

Before POWERS, BRADY and ABOUSSIE, JJ.

POWERS, Justice.

Barbour Trucking Company and its surety, Aetna Insurance Company, appeal from a judgment recovered by the State of Texas in its suit against them for property damage.[1] We will reverse the trial-court judgment and render judgment that the State take nothing by its suit.

## THE CONTROVERSY

Otis E. Conner, in the course and scope of his employment by Jefferson Truck

---

1. In 1980, Barbour as principal and Aetna as surety executed a bond in favor of the State of Texas, whereby they agreed to pay for any and all damage to State highways occasioned by the operation of Barbour's equipment under a permit allowing the use on State highways of "super-heavy or over-size equipment for the transportation of ... such commodities as cannot be reasonably dismantled," and which exceed a specified minimum weight. Tex.Rev.Civ.Stat. Ann. art. 6701a § 1 (Supp.1988). The State sued Aetna on the bond. In the text, we shall for clarity refer only to Barbour, Aetna's liability being derivative of Barbour's.

Lines, drove a motor truck into a state-owned bridge in Harris County. To recover for the damage to its bridge, the State sued Jefferson on the ground that it was bound by the doctrine of *respondeat superior* to answer for the negligence of its employee Conner. Jefferson failed to appear for trial and judgment was taken against the company by default.

The State sued Barbour as well, contending it was bound *also* to answer for Conner's negligence under these allegations: (1) as Barbour's authorized agent, Conner obtained an oversized-load permit from State authorities (issued in Barbour's name) and drove the truck under Barbour's control; and (2) Barbour and Jefferson were engaged in a joint enterprise and shared control of the truck driven by Conner. After stipulating that Conner's negligence proximately caused damage to the bridge, requiring $19,553.38 to repair, Barbour and the State proceeded to trial on the question of the former's liability for Conner's want of care.

In answer to special issues, the jury found: (1) Conner was not Barbour's agent; (2) Jefferson operated the truck, through Conner, pursuant to a "Master Interchange Agreement" in force at the time between Jefferson and Barbour; and (3) Jefferson operated the truck as an interstate motor carrier under authority of a certificate or permit issued to Barbour by the Interstate Commerce Commission. On these findings, the trial court rendered judgment for the State.

On appeal, Barbour and the State join issue solely on a ground of vicarious liability *not* alleged expressly in the State's trial petition: whether Barbour was bound to answer for Conner's negligence, under the doctrine of *respondeat superior*, because he was Barbour's constructive or "statutory employee" even though he was, concurrently, the literal employee of Jefferson. We will discuss below the "statutory employee" principle.[2] In Barbour's appeal, the company contends the jury findings are insufficient, as stated, to sustain application of the principle; and, if the findings be interpreted in a sense necessary to sustain the "statutory employee" principle, the evidence is legally and factually insufficient to support the findings.

## THE "STATUTORY EMPLOYEE" PRINCIPLE

In 49 U.S.C. § 11107 (Pamp.1988), Congress delegated to the Interstate Commerce Commission a power to impose certain requirements on motor carriers in their operation of motor vehicles, which they do not themselves own, in providing transportation subject to the Commission's jurisdiction.[3] The general purpose of the statute was to enable the Commission to control a number of practices, related to the use of "non-owned" vehicles, that directly affected the regulatory scheme established in the federal Motor Carrier Act of 1935. *American Trucking Assns. v. United States*, 344 U.S. 298, 301, 73 S.Ct. 307, 310, 97 L.Ed. 337 (1953). One particular purpose, implicit in an amendment to the Act, was "to protect the public from the tortious conduct of judgment-proof operators of interstate motor carrier vehicles...." *Price v. Westmoreland*, 727 F.2d 494, 496 (5th Cir.1984).

2. There appears to be no decision by a Texas state court applying the "statutory employee" principle. We assume without deciding that we are bound to apply the principle if it is applicable to the case. Federal common law still survives in those "areas of judicial decision with which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law." *Sola Elec. Co. v. Jefferson Elec. Co.*, 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165 (1942). Ultimately, if an issue is controlled by federal law, state courts exercising concurrent jurisdiction are bound by that law. U.S. Const. art. VI, cl. 2; *Free v. Bland*, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962).

3. The statute presently codified as 49 U.S.C. § 11107 was previously codified as 49 U.S.C. § 305(e), a section of the Interstate Commerce Act, Part II, setting out the powers of the Interstate Commerce Commission in its regulation of motor carriers. Part II, originally enacted as the "Motor Carrier Act, 1935," was incorporated in 1940 as part of the Interstate Commerce Act. See 49 U.S.C.A. § 301 (1963), *Historical Note*. The 1988 pamphlet reflects a partial rewriting and codification of the Interstate Commerce Act.

The terms of § 11107 authorize the Commission to impose the following specific requirements upon motor carriers operating "non-owned" motor vehicles in providing transportation subject to the Commission's jurisdiction: (1) the "arrangement" between the carrier and the owner must be in a writing, signed by the parties, which specifies the compensation payable for use of the vehicle and the duration of the "arrangement"; (2) a copy of the writing must be carried in the vehicle, to which it applies, during the duration of the "arrangement"; (3) the carrier must inspect the vehicle and obtain liability and cargo insurance pertaining to its use; and (4) the carrier must "have control of and be responsible for operating" the vehicle, in compliance with applicable laws, "as if" the carrier actually owned the vehicle. Exercising its delegated power, the Commission promulgated a rather comprehensive set of regulations establishing these and certain subsidiary requirements.[4]

■ Section 11107 and the Commission's regulations have direct and obvious effect

**4.** The regulations distinguish between the "leasing" of another's equipment and its operation resulting from an "interchange" of equipment. Generally speaking, the former is governed by 49 C.F.R. § 1057.11—1057.25 while the latter is governed by *id.* at § 1057.31. The two terms imply somewhat different arrangements between the owner of the equipment and the carrier that uses it to provide transportation subject to the Commission's regulation.

A lease is a

> contract or arrangement in which the owner grants the use of equipment, with or without driver, for a specified period to an authorized carrier for use in the regulated transportation of property, in exchange for compensation.

49 C.F.R. § 1057.2(e). An "interchange" refers to an agreement whereby a motor carrier *having* official authority to carry goods over a particular route obtains, for example, a motor truck from its owner who *lacks* such authority. The authorized carrier receives the truck, with or without driver, and operates it over the particular route to a destination within the carrier's operating authority, thereby saving the time and expense of unloading the cargo from the truck owned by the unauthorized carrier and placing it on a truck belonging to the authorized carrier. *Id.* at § 1057.2(c).

The regulations that pertain to the *leasing* of equipment impose a multitude of requirements. For example, the right to use the equipment must be granted in a written lease signed by the owner and the carrier, which shall specify the time and date or the circumstances on which the lease begins and ends; the lessee must have exclusive possession, control and use of the equipment for the duration of the lease and must assume, in the lease, complete responsibility for its operation; a specific compensation must be stated in the lease along with numerous other detailed items pertaining to payments under the lease, freight bills, charge-back items, maintenance by the lessee of "insurance coverage for the protection of the public" under other commission regulations, and other matters; and a copy of the lease must be placed on the equipment during the period of the lease unless a statement in that regard is carried on the equipment itself. *Id.* at § 1057.12.

The regulations that pertain to the *interchange* of equipment are also comprehensive, the following "conditions" being imposed upon such interchanges: There must be "a written contract, lease, or other arrangement providing for the interchange and specifically describing the equipment to be interchanged," setting forth "the specific point of interchange, how the equipment is to be used, and the compensation for such use" and signed by the parties; the equipment must be interchanged at a point where both carriers have operating authority; the carriage must move on through bills of lading issued by the originating carrier at rates accounted for as if there had been no interchange; certain decals must be removed from the equipment; the carrier receiving the equipment must identify it in specific ways; a signed copy of the interchange agreement must be carried on the equipment; and the carrier receiving the equipment "shall be considered to be the owner of the equipment for the purpose of leasing it to another carrier. *Id.* at § 1057.31. Because the regulations have the force and effect of law, it is said that the relationship under such a lease or interchange is a "statutory relationship." *Simmons v. King,* 478 F.2d 857, 867 (5th Cir.1973); *Cox v. Bond Transportation, Inc.,* 249 A.2d 579, 586 (N.J.), *cert. denied,* 395 U.S. 935, 89 S.Ct. 1999, 23 L.Ed.2d 450 (1969). The detailed requirements set out in the regulations may have consequences outside the regulatory field—specifically, they may have consequences under the "statutory employee" doctrine with which we deal in the present case. For example, it has been said that the only way for a lessee to eliminate its responsibility "as if" it owned and operated the equipment, during the period of the lease, is to remove all legends, decals, or devices (indicating its operation) before it relinquishes the equipment and obtains the proper receipt. *Mellon National Bank & Trust Co. v. Sophie Lines, Inc.,* 289 F.2d 473 (3rd Cir.1961); *Kreider Truck Service, Inc. v. Augustine,* 76 Ill.2d 535, 31 Ill.Dec. 802, 394 N.E.2d 1179 (1979); *Cosmopolitan Mutual Ins. Co. v. White,* 336 F.Supp. 92 (D.C.Del.1972). *See also Wilson v. Riley Whittle, Inc.,* 145 Ariz. 317, 701 P.2d 575 (App.1985) (evidence of oral lease and of carrier's practice of loosely complying with

in the regulatory field committed by Congress to the Commission's supervision. Because their underlying purposes might also be affected outside that field, in ordinary tort actions involving a carrier's use of a "non-owned" vehicle, the courts of several jurisdictions have fashioned and applied the "statutory employee" principle at issue in the present case. The principle holds that a carrier is vicariously liable for injury, caused by the driver's negligent operation of a vehicle, when three factors coincide: (1) the carrier does not own the vehicle; (2) the carrier operates the vehicle, under an "arrangement" with the owner, to provide transportation subject to the Commission's jurisdiction; and (3) the carrier does not literally employ the driver. In these circumstances, the driver is held to be the *constructive* or "statutory" employee of the carrier; and, in consequence of this fiction, the doctrine of *respondeat superior* imposes upon the carrier a vicarious liability for the negligence of its "employee" the driver. *See, e.g., Price,* 727 F.2d at 496; *Simmons v. King,* 478 F.2d 857, 867 (5th Cir.1973).

■■■ Because the "statutory employee" principle imposes liability upon the carrier "as if" it actually or literally employed the negligent driver, the carrier is permitted to raise any defenses available to such an employer under state law. *White v. Excalibur Ins. Co.,* 599 F.2d 50, 53–54 (5th Cir.), *cert. denied,* 444 U.S. 965, 100 S.Ct. 452, 62 L.Ed.2d 377 (1979). That is to say, the "statutory employee" principle is not one of strict liability.

## WHETHER BARBOUR WAS SHOWN TO BE LIABLE ON THE PRINCIPLE OF "STATUTORY EMPLOYEE"

Two factors, essential to the "statutory employee" principle, are undisputed in the

present case: (1) Barbour did not own the motor truck driven by Conner; and (2) Barbour did not literally employ Conner. To sustain Barbour's liability on the "statutory employee" principle, the State was required only to establish the requisite third factor: that *Barbour was operating the truck to provide transportation subject to the Commission's jurisdiction.* Curiously, this ultimate fact, essential to the "statutory employee" principle and Barbour's vicarious liability, was not submitted to the jury for determination. We are left then to inquire whether the ultimate fact is implicit in what the jury *did* determine or whether it was established as a matter of law. We hold it was neither.

In answer to special issues, the jury determined: (1) *Jefferson* operated the truck, through its employee Conner, "pursuant to" the "Master Interchange Agreement" that was in force between Jefferson and Barbour; and (2) *Jefferson* operated the truck as an interstate motor carrier under authority of a permit or certificate issued to Barbour by the Interstate Commerce Commission. How then may one reasonably infer *Barbour's* operation of the truck from the jury's rather specific and express finding that *Jefferson* operated the truck? If we understand correctly the State's theory, the State argues that Jefferson's operation of the truck must be imputed to Barbour, *as a matter of law,* for the reasons next to be discussed.

■■■ It is undisputed that Conner applied for and obtained from State authorities a permit to haul the oversize cargo, based on *his* representation that *he acted for Barbour in whose name the permit was is-*

---

the regulations); *in accord Cox v. Bond Transportation, Inc.,* 249 A.2d 579 (N.J.), *cert. denied,* 395 U.S. 935, 89 S.Ct. 1999, 23 L.Ed.2d 450 (1969); *Rediehs Exp., Inc. v. Maple,* 491 N.E.2d 1006 (Ind.App.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 762 (1987), (lessee liable where truck was operated within terms of written lease and bore lessee's identification decal and Commission number at time of collision). In the present case, the motor truck

driven by Conner bore Jefferson's decals and none pertaining to Barbour; and no evidence was adduced beyond the simple existence of the "Master Interchange Agreement" to show that a lease or interchange of the truck *had* occurred under that agreement or that the vehicle *was* being operated thereunder. Thus, the State's argument in the present case, that *Barbour* operated Jefferson's truck, is actually an argument from silence alone.

*sued.*[5] We hold these facts do not justify our assigning an opposite meaning to what the jury found—that *Jefferson* operated the truck driven by Conner. The jury found expressly that Conner was *not* Barbour's agent on the "occasion in question," and his obtaining the permit in Barbour's name may not be imputed to Barbour in light of that finding. (The State does not challenge the finding.)

■ The State contends next that we should impute Jefferson's operation to Barbour, as a matter of law, because the jury found expressly that Jefferson operated the truck *pursuant to* the "Master Interchange Agreement." Because Barbour did not own the truck or employ Conner, this finding necessarily implies in the State's view that Barbour *had leased* from Jefferson the truck and Conner's services as contemplated in the master agreement. We reject the State's argument for several reasons.

Firstly, the interchange of equipment under the master agreement is permissive merely and the expression "pursuant to" means, in ordinary usage, "in conformity with." If the jury had found that *Barbour* operated the truck "pursuant to" the master agreement, one might naturally and reasonably infer that *Barbour* had leased the truck and driver from Jefferson "pur-

suant to" the master agreement. But we have no such finding. We have, instead, the very opposite finding—that *Jefferson* operated the truck "pursuant to" the agreement. The master interchange agreement permitted, but did *not* require, the parties to interchange and lease vehicles "from time to time, as the need" arose. Therefore, when the fact of Jefferson's operation of the truck is coupled with the other established facts that Jefferson owned the truck and employed the driver, the only reasonable inference is that Jefferson, on the particular trip in issue, operated its own truck in its own carriage and for its own account. Jefferson's operation conformed to the master interchange agreement in the sense that it did not *bind* either party to lease the other's vehicle, on a particular trip or otherwise.

Secondly, if the jury finding—that Jefferson operated the truck "pursuant to" the master interchange agreement—be given the strange meaning that Barbour had leased the truck and driver from Jefferson, then the finding would not be supported by factually or legally sufficient evidence. The "Master Interchange Agreement" permitted Jefferson and Barbour to exchange equipment, with or without driver, at any time after its execution, *provided* in each instance the parties executed individual

---

5. Jefferson lacked authority from the Commission to operate its trucks in Texas, although it possessed operating authority from the Commission with respect to its home state of Louisiana and certain other states. Barbour, on the other hand, possessed such operating authority both in Louisiana and in Texas. Consequently, for Conner's driving of the Jefferson truck to be lawful in Texas, it would be necessary for the truck to be operated "pursuant to" the "Master Interchange Agreement" between Barbour and Jefferson.

In any event, on his trip from Louisiana toward Houston, Conner stopped in Orange, Texas, on the Louisiana–Texas line, and obtained from the local office of the Texas State Department of Public Highways and Transportation a permit, issued in Barbour's name, giving permission for Barbour to transport a large "portable building" along specified highways to a point in Houston, Texas. In the application (which is also the permit form), Conner requested permission to transport the building along the indicated highways and affixed his signature to the application under the following printed legend:

I, the undersigned, certify that I am authorized to sign this application for the person or firm whose name appears on this application committing the above obligation, and that the statements in this application are true and correct.

I further certify that the equipment covered by this application is under lease from_____

SIGNED: _____
BY: [Conner's signature]
TITLE: _____

\* \* \* \* \* \* \*

The instrument is blank where it calls for the lessor's name to be stated. Because we hold as we do on other grounds, we need not consider the effect of the blank left where Conner ostensibly would have inserted Jefferson's name had he been acting in truth for Barbour who had leased the equipment from Jefferson. The same anomaly is implied, of course, in Conner's omission to supply Barbour's name as the applicant and Conner's title in acting for Barbour.

agreements pertaining to the specific case.[6] No such individual agreement was shown in or suggested by the evidence adduced in the present case.[7] In the absence of any other evidence, it would be irrational to infer that Barbour had leased the truck "pursuant to" the master interchange agreement when the evidence did not show that the prerequisite to such a lease had been satisfied as the agreement itself demanded.

■ The State argues, however, that the burden lay upon Barbour to show the non-existence of such a lease because, in the long interval between Conner's collision with the bridge and the date of trial, Barbour had routinely destroyed certain of its records, including those which might have contained an individual lease if one had existed. The State also theorizes that Jefferson and Barbour may have routinely disregarded the provision in the master agreement which required individual leases; or they might have done so this particular instance. We reject these arguments and theories. The burden lay upon the State to obtain a finding that Barbour oper-

ated the truck to provide transportation subject to the Commission's jurisdiction, if the State wished to sustain the "statutory employee" principle in this case. The State chose not to plead that controlling issue or submit it to the jury. It chose to wait an inordinate period of time (eight years) before trying its allegations, with no justification that appears in the record. The State offered no evidence that Barbour and Jefferson disregarded the requirements of the master lease routinely or on the occasion made the basis of the State's claim. If we assume we have the power to reverse the burden of proof, we are not persuaded that we should do so in these circumstances in order to torture strange meanings from what the jury found expressly based upon the evidence adduced—that Jefferson operated the motor truck.

■ The State points next to the undisputed fact that a Barbour official, in a letter mailed to the State shortly after the collision, admitted that *Jefferson* was operating at the time under the "Master Interchange Agreement." [8] Should we there-

6. Under the "Master Interchange Agreement," the terms "lessor" and "lessee" refer to either of the parties, Barbour or Jefferson, according to which of them furnished a particular item of equipment on a particular "movement." The equipment might be furnished with or without a driver. Among other provisions, the "Master Interchange Agreement" contains the following:

Lessor agrees to lease necessary equipment from time to time, as the need ... arises.... The description of each individual unit of equipment interchanged, the interchange points, duration and usage of the equipment will be defined in *individual equipment interchange agreements executed at the time of interchange*, such individual agreements to become supplemental to and a part of this master lease interchange agreement.

\* \* \* \* \* \*

This agreement shall remain in force and effect ... only during such times as the equipment covered hereby is operated by and under the exclusive use, direction and control of the lessee, and within its authorized service.

\* \* \* \* \* \*

While such equipment is in its possession and control, the lessee shall assume all responsibility to the public for the safe operation of said equipment.

\* \* \* \* \* \*

(emphasis supplied). By and large, the argument indicates an intent to make the particular

supplemental interchanges conform to the Commission's regulations discussed above.

7. It is this absence of any proof of a lease that distinguishes this case from those cases cited in the State's briefs. *Cf. Wilson v. Riley Whittle, Inc.,* 145 Ariz. 317, 701 P.2d 575 (App.1985) (evidence of an oral lease and of carriers' practice of loosely complying with the ICC regulations); *in accord Cox v. Bond Transportation, Inc.,* 53 N.J. 186, 249 A.2d 579, *cert. denied,* 395 U.S. 935, 89 S.Ct. 1999, 23 L.Ed.2d 450 (1969). Similarly, the State's reliance on *Rediehs Exp., Inc. v. Maple,* 491 N.E.2d 1006 (Ind.App.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 762 (1987), is misplaced because the lessee's liability in that case rested upon the fact that the truck was operating within the terms of a written lease and was carrying the lessee's identification decal and ICC number at the time of the accident. These factors made that defendant liable as a matter of law. No such factors are found in the evidence adduced in the present case.

8. Barbour's letter was in response to the State's demand that Barbour pay for Conner's damage to the bridge. The letter, addressed to the Attorney General of Texas, states in part:

\* \* \* \* \* \*

This was a very serious and costly accident with $19,000 still unpaid in State property

fore convert the jury finding that Jefferson operated the truck into a finding that Barbour did so? We believe the admission might by inference support a jury finding that *Barbour* had operated the truck under the master interchange agreement, but the jury did not find that. Instead, the jury found that *Jefferson* had operated the truck "pursuant to" that agreement. The finding is literally *consistent* with the letter, which admits only that *Jefferson* operated the truck under the master agreement. The letter does *not* admit that *Barbour* operated the truck under the agreement. We have discussed these distinctions above and need not repeat them here.

■ Finally, the State argues for an inference to be drawn from the jury's express finding that Jefferson operated the truck "as an interstate motor carrier" and "under a permit or certificate" issued to Barbour by the Commission. According to the State's view, this finding implies Barbour's operation of the truck on a theory that Barbour had delegated or transferred its federal operating authority to Jefferson, making Jefferson's operation *tantamount* in law to Barbour's operation of the truck.

There is no evidence to support a determination that Barbour had attempted to transfer its federal operating authority to Jefferson. We believe any such evidence would have to be evaluated, in any case, in light of what the law requires for such transfers to occur. Generally speaking, the authority granted in an official license cannot be transferred without consent of the licensing authority unless the pertinent statute provides otherwise. 53 C.J.S. *Licenses* § 59 (1987). Congress indeed authorized the transfer of the operating authority evidenced by the permits and certificates issued by the Commission, *provided* the transfer is effectuated in compliance with

the statutory requirements set out in 49 U.S.C. §§ 10921–10935 (Pamp.1988). There certainly is no evidence that a transfer of operating authority, from Barbour to Jefferson, had occurred in compliance with these provisions or otherwise. For these reasons, we reject the State's contention.

■ There being no express finding by the jury, on the essential ultimate fact of Barbour's operation of the truck driven by Conner, the judgment against Barbour cannot be sustained on the principle that Conner was Barbour's "statutory employee." *Driver v. Worth Construction Company,* 273 S.W.2d 603, 606 (Tex.1955). Nevertheless, we have assumed above that the jury's express findings are ambiguous as to the existence of that ultimate fact, the assumption being necessary to sustain the judgment. Accordingly, we have examined the pleadings and the evidence to ascertain whether they might support a reasonable inference that Barbour operated the truck, even though the findings expressly declare that Jefferson did so. *State v. Hale,* 146 S.W.2d 731, 739 (Tex.1941). We have concluded they do not.

We therefore reverse the judgment below and render judgment that the State take nothing by its suit.

BRADY, J., not participating.

---

damage. We feel that if legal action is taken any suit be brought [sic] against Jefferson Truck Lines. At the time of the accident Jefferson Truck Lines was operating under a master interchange agreement with our company.

This type of agreement or contract allows a carrier with no operating authority to haul their [sic] own freight under a company that does have authority.