ILLINOIS BULK CARRIER, INC., and Illiana Disposal Partnership d/b/a Allied Waste Services of Northwest Indiana, Appellants–Defendants,

v.

Robert W. JACKSON and Daniel M. Jackson, Minors, by their next Friends Robert D. Jackson and Margie Jackson; Suzanna R. Postma and Jolene Postma, Minors, by their next Friends Jeff Postma and Tina Postma; Jeff Postma; Tina Postma; and Kirk Shule, Appellees–Plaintiffs.

No. 45A03–0808–CV–408.

Court of Appeals of Indiana.

June 16, 2009.

Transfer Denied Sept. 24, 2009.

David A. Wilson, Bokota Wilson McCloskey & Long, P.C., Merrillville, IN, Attorneys for Appellant Illinois Bulk Carrier, Inc.

Edward W. Hearn, Susan K. Swing, Johnson & Bell, Ltd., Merrillville, IN, Attorneys for Appellant Illiana Disposal Partnership.

James L. Clement, Brooke S. Shreve, Lucas, Holcomb & Medrea, LLP, Merrillville, IN, Attorneys for Appellees Robert W. Jackson and Daniel M. Jackson.

Timothy R. Kuiper, Austgen Kuiper & Associates, Crown Point, IN, Attorneys for Appellees Suzanna R. Postma, Jolene Postma, Jeff Postma, and Tina Postma.

## OPINION

CRONE, Judge.

### Case Summary

Illinois Bulk Carrier, Inc. ("IBC"), and Illiana Disposal Partnership, doing business as Allied Waste Services of Northwest Indiana ("Allied Waste") (collectively "Appellants"), bring this interlocutory appeal of the denial of their summary judgment motions on the personal injury complaint filed against them by Robert W. Jackson and Daniel Jackson, minors, by their next friends Robert D. Jackson and Margie Jackson; Suzanna R. Postma and Jolene Postma, minors, by their next friends Jeff Postma and Tina Postma; Jeff Postma; Tina Postma (collectively "Appellees"); and Kirk Shule.[1]  We reverse.

### Issues

I.  Whether Allied Waste and IBC have demonstrated that as a matter of law neither is liable for the negligence of Wireman Trucking & Excavating, Inc. ("Wireman"), and its employee, Allan Irvine, under the Federal Motor Carrier Safety Regulations; and

---

1.  Shule did not file a brief in this appeal.

II. Whether Allied Waste and IBC have demonstrated that as a matter of law neither is liable for the negligence of Wireman and its employee, Irvine, under Indiana common law.

## Facts and Procedural History

This case arises out of an October 26, 2005, multi-vehicle accident that occurred on State Road 231 in Crown Point, in which Robert and Daniel Jackson and Suzanna, Jolene, and Tina Postma were injured. A truck involved in this accident was owned by Wireman, a federally registered motor carrier, and was driven by Wireman's employee, Irvine.

Wireman is linked to Appellants, Allied Waste and IBC, as follows: On the day of the accident, Allied Waste, a federally registered motor carrier, had a written purchase order ("the Purchase Order") with Ispat–Inland, Inc., now known as Mittal Steel USA, Inc. ("Mittal"), to remove and dispose of Mittal's waste. Under the Purchase Order, Allied Waste was required to provide appropriately permitted, licensed, and insured transport haulers. Allied Waste itself transported the non-bulk, high-volume waste, such as wood, asbestos, trash, and back house filters from Mittal's operations in East Chicago to Allied Waste's Newton County landfill in Brook. However, Allied Waste subcontracted for the removal of high volume bulk waste such as filter cake, commonly referred to as "sludge."[2] One such subcontractor was IBC, also a federally registered motor carrier, with whom Allied Waste had an oral agreement to pay IBC on a per-ton basis to haul as much material as it could. In turn, IBC subcontracted to various motor carriers, including Wireman. There was no written agreement between IBC and Wireman.

On October 26, 2005, pursuant to the oral agreement between IBC and Wireman, Wireman was engaged in hauling a load of Mittal's sludge to the Newton County landfill. While hauling the sludge to the landfill, Wireman's employee, Irvine, was involved in the aforementioned multivehicle accident.

Appellees filed separate complaints against Appellants between June 16, 2006, and November 30, 2007, and the cases were consolidated on November 7, 2007. In their complaints, Appellees alleged that Allied Waste and IBC were negligent in (1) hiring transport vehicles with improper permits, licenses, and insurance to haul the sludge; (2) failing to ensure that transport vehicles were driven by competent and properly licensed drivers; (3) failing to require transport vehicles to have been properly maintained; and (4) failing to require drivers to file certificates of insurance. Appellants' App. at 25, 30, 80, 85. Appellees also alleged that Allied Waste was negligent in failing to adhere to the requirements of the Purchase Order and that IBC was negligent in failing to supervise its contractual responsibilities. *Id.*

On January 15, 2008, Allied Waste and IBC each filed motions for summary judgment.[3] Allied Waste asserted that Appellees had no rights under the Purchase Order; Allied Waste had no control over Irvine's activities; Irvine was not a borrowed servant of Allied Waste; Appellees are not third-party beneficiaries to the Purchase Order; and there was no ques-

---

2. The sludge was a nonhazardous waste and did not require the hauler to have a Hazmat placard.

3. Mittal was also named as a defendant in Appellees' complaints. It filed a motion for summary judgment, which was granted. Appellees do not challenge the grant of summary judgment in Mittal's favor.

tion of fact supporting a theory that Allied Waste was negligent in hiring IBC. *Id.* at 173–180. IBC asserted that it was not liable for Wireman's negligence because Wireman was an independent contractor for IBC; Irvine was not a borrowed servant of IBC; IBC was not charged with a non-delegable duty; and Appellees are not third-party beneficiaries to the Purchase Order. *Id.* at 192–204.

Appellees filed a response to Appellants' motions for summary judgment, in which they asserted two bases for Appellants' liability: (1) Wireman was the statutory employee of Appellants, and therefore Appellants are vicariously liable for the personal injuries resulting from Wireman's negligence; and (2) Appellants are liable for the personal injuries caused by Wireman based upon the second and fourth exceptions to the general rule of nonliability of a principal for the negligence of an independent contractor. *Id.* at 495, 498.

Following a hearing, on May 15, 2008, the trial court issued its order denying Allied Waste's and IBC's motions for summary judgment. This interlocutory appeal ensued.

### Discussion and Decision

### *Standard of Review*

■ On appeal from a grant or denial of summary judgment, this Court applies the same legal standard as the trial court, i.e., summary judgment is appropriate when no designated genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Winchell v. Guy,* 857 N.E.2d 1024, 1026 (Ind.Ct.App.2006). Our review is limited to those materials designated to the trial court. *Pond v. McNellis,* 845 N.E.2d 1043, 1053 (Ind.Ct.App.2006), *trans. denied.* All facts and reasonable inferences drawn therefrom are construed in favor of the non-movant. *Id.* "A party appealing

the denial of summary judgment carries the burden of persuading this court that the trial court's decision was erroneous." *Ind. Ins. Co. v. Am. Cmty. Servs., Inc.,* 718 N.E.2d 1147, 1152 (Ind.Ct.App.1999). The movant must demonstrate the absence of any genuine issue of fact as to a determinative issue, and only then is the non-movant required to come forward with contrary evidence. *Id.* (citing *Jarboe v. Landmark Cmty. Newspapers of Ind., Inc.,* 644 N.E.2d 118, 123 (Ind.1994)). "We will affirm the denial of summary judgment if it is sustainable on any legal theory or basis found in the evidentiary matter designated to the trial court." *W. Amer. Ins. Co. v. Cates,* 865 N.E.2d 1016, 1020 (Ind.Ct.App.2007), *trans. denied.*

■ Here, Appellees' claims against Appellants sound in negligence. To prevail on a theory of negligence, a plaintiff must prove: (1) that the defendant owed plaintiff a duty; (2) that it breached the duty; and (3) that plaintiff's injury was proximately caused by the breach. *Dennis v. Greyhound Lines, Inc.,* 831 N.E.2d 171, 173 (Ind.Ct.App.2005), *trans. denied.* Summary judgment is rarely appropriate in negligence cases because they are particularly fact sensitive and are governed by a standard of the objective reasonable person, which is best applied by a jury after hearing all the evidence. *Rhodes v. Wright,* 805 N.E.2d 382, 387 (Ind.2004). Nonetheless, summary judgment is appropriate when the undisputed material evidence negates one element of a negligence claim. *Id.* at 385. Whether a defendant owes a duty of care to a plaintiff is a question of law for the court to decide. *N. Ind. Pub. Serv. Co. v. Sharp,* 790 N.E.2d 462, 466 (Ind.2003).

Appellants contend that the trial court erred in denying their summary judgment motions because as a matter of law they are not liable for the negligence of Wire-

man and its employee, Irvine, under either the Federal Motor Carrier Safety Regulations or Indiana common law.

## I. The Federal Motor Carrier Safety Regulations

It is undisputed that Allied Waste, IBC, and Wireman are federally registered motor carriers, each with a Department of Transportation ("DOT") number. Motor carriers such as these are required to comply with the provisions of the Federal Motor Carrier Safety Regulations ("FMCSR"), Title 49, Chapter III, Subchapter B.[4]

It is also undisputed that IBC was an independent contractor of Allied Waste and that Wireman was an independent contractor of IBC. In general, an employer of an independent contractor is not liable for physical harm and damage caused to another by an act or omission of that independent contractor. *Bagley v. Insight Commc'n, Co.*, 658 N.E.2d 584, 586 (Ind.1995); RESTATEMENT (SECOND) OF TORTS § 409. However, an interstate motor carrier can be held vicariously liable for the negligence of an independent contractor pursuant to the FMCSR under certain circumstances. Indeed, the FMCSR "were initially prompted by concerns that certified carriers were evading federal safety requirements by using equipment leased from owner-operators who were exempt from the limitations placed upon certified carriers." *Johnson v. S.O.S. Transp.*, 926 F.2d 516, 523 n. 17 (6th Cir. 1991).

In *Rediehs Express, Inc. v. Maple*, 491 N.E.2d 1006 (Ind.Ct.App.1986), this Court described the situation that the Interstate Commerce Commission regulations, forerunner to the FMCSR, were formulated to address:

The history of the regulations of motor carriers reveals that after the commencement of regulation in 1935, because of stringent and comprehensive rules regulating the conduct, operation, financial ability, and insurance coverage of the motor truck industry, a substantial number of carriers possessing ICC certificates began to use equipment owned and driven by truckers who had no such ICC operating authority. This use was accomplished by a variety of leases, trip leases, and by other arrangements under which owner-operator truckers carried on the operations of the carriers with operating authority. In contracting with such persons the carriers took care to constitute the lessors as independent contractors which enabled them to avoid the commission's safety, financial, and insurance regulations that had been prescribed for equipment and drivers in order to protect the public. Many of the owner-operators without authority were itinerant truckers known as "gypsies," fly-by-night truckers with poor, unsafe equipment who had little financial ability. They may or may not have had adequate insurance. The hard core of the problem was the trip lease and its attendant evils which permitted an indifferent carrier to evade its safety and financial responsibility. The practice of leasing made it difficult in accident cases to fix responsibility, and certified carriers could thus escape the consequences of the regulations and responsibility for accidents by employing irresponsible persons as independent contractors who were not financially accountable and who had no insurance or were under-insured.

---

4. Also, Wireman's employee, Irvine, had a Wisconsin class A commercial driver's license, and his actions as a truck driver were regulated by the FMCSR.

Thousands of unregulated trucks were on the road.

*Id.* at 1010 (citations omitted).

██ The FMCSR eliminate the distinction between independent contractors and employees so that an attempt by motor carriers to avoid liability simply by labeling a driver as an independent contractor is unavailing. *Brown v. Truck Connections Int'l, Inc.,* 526 F.Supp.2d 920, 924 (E.D.Ark.2007). The FMCSR promote public safety by insuring that motor carriers with operating authority are unable to delegate or evade responsibility by means of a contractual device. *See Rediehs,* 491 N.E.2d at 1011 (recognizing effect of ICC regulations). Thus, a DOT-authorized motor carrier will be held liable for the negligence of its "employee" as that term is defined in 49 C.F.R. § 390.5:

> Employee means any *individual,* other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety. Such term includes a driver of a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle), a mechanic, and a freight handler.

(Emphasis added.)

Also relevant as to whether the Appellants may be held vicariously liable for the negligence of Wireman and its employee, Irvine, are the FMCSR provisions governing leases. 49 C.F.R. § 376.11 states that an "authorized carrier may perform authorized transportation in equipment it does not own only under the following conditions: ... There shall be a written lease granting the use of the equipment and meeting the requirements contained in § 376.2." 49 C.F.R. § 376.2(e) defines "lease" as a "contract or arrangement in which the owner grants the use of equipment, with or without driver, for a speci-

fied period to an authorized carrier for use in the regulated transportation of property, in exchange for compensation." In addition, 49 C.F.R. § 376.12(c)(1) states,

> The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.

Finally, 49 C.F.R. § 376(c)(4) states that

> [n]othing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements.

Appellees assert that IBC and Wireman were "statutory employees," that is, employees as defined by the FMCSR, of Allied Waste, and that Wireman was a "statutory employee" of IBC, and therefore Allied Waste and IBC may be held liable for the negligence of Wireman and its employee, Irvine. IBC and Allied Waste argue to the contrary.

██ At the outset, we observe that 49 C.F.R. § 390.5 defines an employee as an "individual." Other courts have adopted a plain language approach to interpreting Section 390.5, and we think this is appropriate as well. *See Pouliot v. Paul Arpin Van Lines, Inc.,* 292 F.Supp.2d 374, 378 (D.Conn.2003) (adopting plain language approach). IBC and Wireman are not individuals. Thus, under a plain reading of 49 C.F.R. § 390.5, IBC and Wireman cannot be "employees." *See Brown,* 526

F.Supp.2d at 925 ("By using a different term to define employer, the language of the regulation itself indicates that in this instance, 'individual' and 'person' are not synonymous, which further indicates that here, 'individual' does refer to human beings and not to corporations or other legal persons."). Therefore, the statutory employment theory of vicarious liability is inapplicable to this case.

We find support for this conclusion in *Brown*. There, Penske Truck Leasing Company hired Truck Connections International ("TCI") as an independent contractor to transport Penske-owned vehicles. TCI hired Davis and Godwin to drive the trucks transporting the Penske trucks. Davis and Godwin were involved in a collision, and Tiffany Brown was fatally wounded. William Brown, as the administrator of Tiffany's estate, filed suit against Penske, TCI, Davis and Godwin. Brown argued that TCI was a statutory employee of Penske. The court entirely rejected the application of the statutory employee theory because TCI was not an individual, and therefore was not a statutory employee of Penske as that term is defined in 49 C.F.R. § 390.5. *Id.* at 924; *see also Pouliot*, 292 F.Supp.2d at 379 ("Thus, the definition of 'employee' in § 390.5 would apply to an independent contractor while the contractor is driving his commercial motor vehicle on any public or private road or highway.").

There are two additional compelling reasons to find that the statutory employment theory of vicarious liability is inapplicable to the present circumstances. First, IBC argues that "[t]he doctrine of statutory employee was meant to ensure that any fault attributed to the driver of an owner/operator, not subject to the FMCSR, driving or hauling for an interstate motor carrier must be imputed to the carrier, which cannot purge itself of liability by applying the label of 'independent contractor' to the driver." IBC's Appellant's Br. at 9. Here, Wireman is a registered DOT motor carrier subject to the FMCSR. This is not analogous to the situation the FMCSR were formulated to address. *See Rediehs*, 491 N.E.2d at 1010. Appellees assert that the "operating authority, or a Department of Transportation number has no bearing on the FMCSR definition of employee" and that it "is absolutely clear from the provisions above that an independent contractor is an employee regardless of its own permitted authority (DOT authorization)." Appellees' Br. at 26–27. We find the fact that the circumstances here are not like those targeted by FMCSR more persuasive than Appellees' bald assertions.

Secondly, Allied Waste states that

a holding such as the one the Appellees urged the Lake Superior Court to adopt—finding multiple motor carriers to constitute statutory employees of a single operator of a single piece of equipment—would be completely at odds with the requirement of Section 376.12 that the leasing carrier have "exclusive possession" of the leased equipment. Indeed, were the Court to adopt the Appellees' position in this case, mass confusion would abound as to who would be required to properly inspect, maintain and repair equipment involved in transportation. Section 376.12 is clear that it is the motor carrier to whom "exclusive possession" rests that has ultimate responsibility for the operation of the equipment under the FMC[S]R and, thereby, is considered the statutory employee of the operator of that equipment under Section 390.5.

Allied Waste's Appellant's Br. at 15. Accordingly, based on the plain language of Section 390.5 and the purpose of the FMCSR, we conclude that IBC and Wire-

man are not statutory employees, and therefore Allied Waste and IBC cannot be held liable for Wireman's negligence or the negligence of Wireman's employee under the FMCSR.

However, we observe that the statutory employment theory of vicarious liability was analyzed differently in *Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828 (Tex.App.2006), apparently the only published case similar to the one at bar. Like this case, *Omega* involved a multi-vehicle accident. Several trucks were involved, but for our purposes, only the truck driven by Fabian Cardenas, which was owned by Omega Contracting, Inc., is of interest. Cardenas was employed by Omega and was driving the Omega truck under a "pass through arrangement" between Omega and Dowdy–Ferry Sand and Gravel Company. Another truck driver involved in the accident, Juan Torres, sought to hold Dowdy–Ferry vicariously liable for Cardenas's negligence. The *Omega* court explained the pass through arrangement as follows:

A "pass through arrangement" is when a carrier with no work for its trucks hauls loads for another carrier that has too much work. In this instance, Omega realized on April 16 that it had no work for its trucks on April 17. Omega's dispatcher called Dowdy–Ferry to see if Dowdy–Ferry had excess work that Omega's trucks could perform. Dowdy–Ferry did have excess work, and Omega agreed to send its drivers to haul loads for a Dowdy–Ferry customer. Dowdy–Ferry passed along the customer's instructions about the time, place, and material to be hauled to Omega. When the job was done, Dowdy–Ferry would invoice the customer and collect payment but then pass 100% to Omega for the loads hauled by Omega trucks; hence the term "pass through arrangement." *Id.* at 846–47.

Torres argued that Cardenas was Dowdy–Ferry's statutory employee under FMCSR, and therefore Dowdy–Ferry was vicariously liable for Cardenas's negligence. The *Omega* court rejected Torres's argument as follows:

Statutory employment is a theory of vicarious liability created by the FMCSR. Under the FMCSR, motor carriers have both a legal right and duty to control leased vehicles operated for their benefit. The regulations create a statutory employment relationship between the employee of the lessor-owner and the lessee. An interstate carrier's liability for equipment and drivers covered by leasing agreements is governed by the FMCSR rather than common-law doctrines of respondeat superior. The purpose of the statutory employment regulations is to ensure that carriers will be fully responsible for the maintenance and operations of leased equipment and the supervision of the borrowed drivers, thereby protecting the public from accidents, preventing public confusion about who was financially liable if accidents occurred, and providing financially responsible defendants.

The threshold question in Torres's statutory employment claim is whether Dowdy–Ferry leased Cardenas's truck from Omega. Section 376.2 of the FMCSR defines "lease" as "[a] contract or arrangement in which the owner grants the use of equipment, with or without driver, for a specified period to an authorized carrier for use in the regulated transportation of property, in exchange for compensation." "Use" in the phrase "the owner grants the use of equipment" is not defined by section 376.2. Section 376.11, which sets out

general leasing requirements, contemplates that a lease involves the transfer of possession from the owner to the lessee: "Receipts, specifically identifying the equipment to be leased and stating the date and time of day possession is transferred, shall be given. . . ." Section 376.11 also requires that a lease be in writing. Section 376.12 sets out the requirements of a written lease, which include the requirement that "[t]he lease shall provide that the authorized carrier lessee shall have the exclusive possession, control, and use of the equipment for the duration of the lease." Thus, under the FMCSR, a lease involves the possession, control, and use by one carrier of equipment owned by another.

We have already concluded that Dowdy–Ferry conclusively negated the issue of whether it had the right to control Cardenas. The same summary judgment evidence conclusively negates Dowdy–Ferry's right to control Cardenas's truck. Likewise, the summary judgment evidence conclusively proves that Dowdy–Ferry never took possession of Cardenas's truck.

Torres contends the summary judgment evidence raises fact issues on each of the elements of statutory employment set out by the Austin Court of Appeals in *John B. Barbour Trucking Co. v. State*, 758 S.W.2d 684 (Tex.App.-Austin 1998, *writ denied*). According to *Barbour*, a carrier is deemed the statutory employer of a nonemployee driver when (1) the carrier does not own the vehicle, (2) the carrier operated the vehicle under an arrangement with the owner to provide transportation subject to federal regulations, and (3) the carrier does not literally employ the driver. If we were to adopt the *Barbour* elements, only the second element would be in question; it is undisputed that Dowdy–Ferry did not own Cardenas's truck and did not liter-

ally employ Cardenas. The word "operated" in the second element connotes control and possession. Thus, even under the *Barbour* test, Dowdy–Ferry conclusively negated an essential element of Torres's statutory employment allegation. We therefore conclude that the pass through arrangement between Omega and Dowdy–Ferry was not a lease under the FMCSR. The doctrine of statutory employment is not applicable to Torres's claims against Dowdy–Ferry.

*Id.* at 848–49 (some citations omitted).

According to *Omega*, the FMCSR may create a statutory employment relationship between the independent contractor's employee and the principal contractor. Thus, under Omega, the dispositive question is whether Wireman's employee, Irvine, was a statutory employee of Allied Waste and/or IBC.

Allied Waste and IBC assert that *Omega* dictates a result in their favor. They argue that their roles in this case are analogous to that of Dowdy–Ferry: (1) there were no "lease" agreements between Allied Waste and IBC or between IBC and Wireman; (2) neither Allied Waste nor IBC had any control over Irvine's truck; and (3) the arrangement with Wireman was similar to the "pass through arrangement" between Omega and Dowdy–Ferry. We do not think that the arrangement with Wireman is a pass through arrangement. Omega received 100% of the receipts collected by Dowdy–Ferry for the hauls it made for Dowdy–Ferry's customers. Dowdy–Ferry was not using Omega trucks for its benefit. Here, both Allied Waste and IBC benefitted financially from Wireman's hauling of Mittal's sludge.

■ Nevertheless, we agree with Appellants that the statutory employment theory of vicarious liability is inapplicable

to them in this instance. The *Omega* court focused its analysis on whether Dowdy–Ferry "leased" Cardenas's truck from Omega as that term is used in the FMCSR. Here, there was no written or verbal lease agreement entitling either Allied Waste or IBC to use the truck that Irvine was driving. Nevertheless, a lease may be created by the conduct between the parties. *See Williamson v. Steco Sales, Inc.,* 191 Wis.2d 608, 530 N.W.2d 412, (Wis.App.1995) ("[A] lease may be formed by conduct or words; it need not be written."). "Although ICC regulations require the carrier to have a written lease, the failure to have one does not absolve the carrier of liability if an oral lease exits." *Id.* The *Omega* court found that Dowdy–Ferry had conclusively negated that it had any right to control and ever took possession of Cardenas's truck. Thus, we ask whether Allied Waste and IBC have conclusively demonstrated that they had no right to control and never took possession of the truck Irvine was driving.

■ Our review of the record shows that the hauling of Mittal's waste proceeded as follows. Irvine reported to Wireman's place of business and picked up a truck to drive. He conducted a mechanical inspection of the truck. He then proceeded to Mittal's facility.[5] At Mittal, Irvine waited for the guards to open the gate and informed them that he was with IBC. A Mittal employee loaded the truck with sludge to be taken to Allied Waste's landfill. Irvine would receive paperwork from an IBC employee, on which he wrote his name and truck number. He would depart through the south gate and proceed to the landfill using a route of his choice. At no time did IBC or Allied Waste take possession of Irvine's truck. Neither IBC nor

Allied Waste controlled, maintained, or serviced Irvine's truck. As such, Appellants have carried their burden to negate their control and possession of Irvine's truck, thereby precluding the application of the statutory employment theory of vicarious liability. Appellees state that the trial court thought there was a question of fact as to whether Allied Waste had control over the truck, as it is unknown whether Allied Waste could have rejected Wireman's trucks. Appellees' Br. at 10. "Under the FMCSR, a lease involves the possession, control, and use by one carrier of equipment owned by another." *Omega,* 191 S.W.3d at 849. Thus, Allied Waste's mere ability to reject a Wireman truck would not be sufficient to create a lease under the FMCSR. Accordingly, even under *Omega,* Allied Waste and IBC may not be held vicariously liable for the negligence of Wireman and its employee. We conclude that Allied Waste and IBC are entitled to judgment as a matter of law that they are not liable for Wireman's negligence or that of its employee pursuant to the FMCSR.

## II. Indiana Common Law

### A. Non-delegable Duty

■ As we noted earlier, there is no dispute that Wireman was an independent contractor of IBC and that IBC was an independent of Allied Waste. Also, we observed that as a general rule, a principal is not liable for the negligence of an independent contractor. *Bagley,* 658 N.E.2d at 586. There are, however, five exceptions to this general rule of nonliability:

(1) where the contract requires the performance of intrinsically dangerous work;

5. Irvine did not always drive to Mittal. Sometimes he hauled material for other businesses. Appellants' App. at 222.

(2) where the principal is by law or contract charged with performing the specific duty;

(3) where the act will create a nuisance;

(4) where the act to be performed will probably cause injury to others unless due precaution is taken; and

(5) where the act to be performed is illegal.

*Id.* "The duties associated with Indiana's five exceptions are considered non-delegable, and an employer will be liable for the negligence of the contractor, because the responsibilities are deemed 'so important to the community' that the employer should not be permitted to transfer these duties to another." *Id.* at 587 (quoting *Cummings v. Hoosier Marine Props., Inc.*, 173 Ind.App. 372, 385, 363 N.E.2d 1266, 1274–75 (1977)). "The exceptions encourage the employer of the contractor to participate in the control of work covered by the exceptions in order to minimize the risk of resulting injuries." *Id.* at 588.

Appellees claim that (1) Allied Waste had a non-delegable duty to participate in the control of the work in order to minimize the risk of injury and (2) there is a genuine issue of material fact as to whether IBC owed such a duty. Appellees' theories of recovery are based on the second and fourth *Bagley* exceptions.

### 1. The Second Exception

First, Appellees assert that Appellants were charged by contract to exercise reasonable care in the selection of transport vehicles, that contract being the Purchase Order between Mittal and Allied Waste. Interpretation of a written contract is achieved by ascertaining "the intent of the parties at the time the contract was executed as disclosed by the language used to express their rights and duties." *Merrill v. Knauf Fiber Glass GmbH*, 771 N.E.2d 1258, 1268 (Ind.Ct.App.2002), *trans. denied.*

In determining whether a party is charged with a specific duty of care under a contract, the court examines all of the provisions set forth in the agreement. Moreover, the assumption of duty by contract exception to the general rule of nonliability is not triggered merely because a contractor may have a right to inspect and test the work, approve the work and/or supervise employees of the independent contractor, or even by requiring the contractor to follow company safety rules. For this exception to apply, a contract must provide for a specific duty of care, evidence that the duty was breached, and evidence that the breach proximately caused the injury.

*Beatty v. LaFountaine*, 896 N.E.2d 16, 23 (Ind.Ct.App.2008) (citations omitted), *trans. denied* (2009). If a contract affirmatively evinces intent to assume a duty of care, actionable negligence may be predicated upon the contractual duty. *Hale v. R.R. Donnelley & Sons*, 729 N.E.2d 1025, 1028 (Ind.Ct.App.2000), *trans. denied* (2001).

As to whether the Purchase Order charged Allied Waste with a specific duty of care to users of the public roads, we find that *Walker v. Martin*, 887 N.E.2d 125 (Ind.Ct.App.2008), *trans. denied*, provides some guidance. In that case, Martin, who was driving a tractor-trailer, ran a red light and struck a car, resulting in the death of its passenger, Christopher Moore. At the time of the collision, Martin was hauling logs, which had been purchased by G.R. Wood, Inc., from LaFountaine Logging to Wood's plant in Mooresville. Martin was LaFountaine's primary log hauler. Martin owned both the semi-tractor and trailer used to haul the logs. As a result of the accident, the Moores filed a wrongful death suit against Martin, LaFountaine, and Wood.

LaFountaine moved for summary judgment, arguing that Martin was an independent contractor and that LaFountaine could not be held liable for his acts. The trial court granted LaFountaine's summary judgment motion, and the Moores appealed. They asserted that LaFountaine's contract with Wood imposed a specific duty of care, and therefore, LaFountaine should be held liable for Martin's actions. The Moores relied on the following language: "The undersigned agrees that he will furnish the equipment and pay all employees assisting in the delivery of said lumber (logs) and that all persons in such work shall be subject to his sole exclusive control." *Id.* at 135.

The *Walker* court rejected the Moores' argument, concluding as follows:

> [T]here is no indication that LaFountaine intended to assume a specific duty as to Christopher [Moore], travelers on the public roadway, or even a general duty of care regarding the hauling of logs. The agreement does not define any duty of care or mention the assumption of any specific duty by LaFountaine. Therefore, the Moores have failed to show that this exception to the general rule of non-liability applies.

*Id.* at 136.

In *Armstrong v. Cerestar, USA, Inc.*, 775 N.E.2d 360 (Ind.Ct.App.2002), *trans. denied* (2003), this Court declined to find that Cerestar, the owner of a milling plant, owed a duty of care to a truck driver, Armstrong, who was injured while removing sludge from Cerestar's plant pursuant to a contract between Cerestar and Armstrong's employer, Wheelabrator Water Technologies, Inc. That contract read, "[Wheelabrator] will obtain advice from [Cerestar's] Safety Director as to [Cerestar's] safety regulations and agrees to conform thereto." *Id.* at 371. We concluded that this provision did no more than require Wheelabrator to obtain and observe Cerestar's safety rules. *Id.* at 372. "Without more, there is no assumption of duty pursuant to this purchase order." *Id.*

By way of contrast, in the context of a contractor's duty of care to its subcontractor's employees, we have found that the following language created a contractual duty of care:

> The Contractor shall take all necessary precautions for the safety of employees on the work, and shall comply with all applicable provisions of Federal, State, and Municipal safety laws and building codes to prevent accidents or injury to persons on, about or adjacent to the premises where the work is being performed. . . . Contractor shall designate a responsible member of its organization on the work, whose duty shall be the prevention of accidents.

*Stumpf v. Hagerman Constr. Corp.*, 863 N.E.2d 871, 877 (Ind.Ct.App.2007), *trans. denied.* Also, in *Perryman v. Huber, Hunt & Nichols, Inc.*, 628 N.E.2d 1240 (Ind.Ct.App.1994), *trans. denied*, we found that the contract charged the primary contractor with a duty of care for all the employees on the work site, including employees of its subcontractors. The contract between the primary contractor, HHN, and the owner of the premises provided: "The Construction Manager [HHN] hereby agrees that it will comply with all applicable state and federal statutes and other governmental regulations pertaining to employment, and that it will require like compliance therewith from all Trade Contractors related to the Project." *Id.* at 1244. The contract also provided that HHN was responsible for reviewing the safety programs of its subcontractors and making recommendations, and HHN employed a safety officer to oversee its subcontractors' operations.

Here, the Purchase Order requires Allied Waste to "[p]rovide appropriately permitted, licensed & insured transport vehicles." Appellants' App. at 209. The Purchase Order further provides that Allied Waste was to include the following information:

—Dot/EPA Carrier Safety Rating

—EPA Identification #

—Certificate(s) of Insurance

—State Transporter Permit Number

—Spill contingency Plan(s)

*Id.* Comparing this language to that contained in the contracts in *Walker, Armstrong, Stumpf,* and *Perryman, supra,* we do not think it evinces an intent of Mirtal and Allied Waste to charge Allied Waste with a specific duty of care to users of public roadways.[6]

As to IBC, Appellees assert that the "trial court indicated that there may be a question of fact as to which of the terms from Mittal's contract with Allied Waste are implied into Allied Waste's contract with [IBC], because the contract is oral, not written." Appellees' Br. at 9. Having found that the Purchase Order did not charge Allied Waste with a specific duty of care to users of public roadways, it follows that any terms of the Purchase Order incorporated into Allied Waste and IBC's oral agreement did not charge IBC with a specific duty of care to users of public roadways. Accordingly, Allied Waste and IBC have demonstrated that the contractual duty exception to the general rule of nonliability does not apply and that they are entitled to judgment as a matter of law.[7]

---

**6.** Appellees state that the trial court indicated that "there may be a question of fact as to whether the Purchase Order required Allied Waste to check the safety of the vehicles it used to transport sludge." Appellees' Br. at 10. Appellees point to no language in the Purchase Order that creates such a requirement or to any fact that suggests that it does.

The dissent concludes that the Purchase Order between Mittal and Allied Waste is more like the contracts in *Stumpf* and *Perryman* than those in *Walker* and *Cerestar.* In addition to the language relied upon by the Appellees to support their argument, the dissent quotes a paragraph from another section of the Purchase Order. However, the dissent does not include the last sentence of that paragraph, which we think demonstrates that the warranty was for the benefit of Mirtal and not for users of public highways. The paragraph in its entirety states:

Additional warranty (additional to other warranties, if any):

Supplier warrants that the work and services shall be performed with that degree of skill, care, and judgement [sic] customarily accepted as sound, quality, professional engineering practice and procedure and that the supplier shall exercise sufficient diligence to insure the technical correctness and accuracy of the work and services. *The supplier shall re-perform, at its sole ex-*

*pense, any work and services that are deficient because of supplier's failure to perform said work and services in accordance with [Mittal's] instruction and/or standards.*

Appellants' App. at 211–12 (emphasis added). In *Stumpf* the contract stated specifically, "The Contractor shall take all necessary precautions for the safety of *employees on the work.*" 863 N.E.2d at 877 (emphasis added). In *Perryman,* the contract provided that the primary contractor would (1) require all contractors to comply with federal law pertaining to employment, (2) be responsible for reviewing the safety programs of its subcontractors, and (3) maintain a full-time staff at the job site to direct and monitor the subcontractors. 628 N.E.2d at 1244. While we recognize that this is a close case, we do not think that the language in the Purchase Order is sufficiently similar to that in either *Stumpf* or Perryman such that it creates a specific duty of care to the users of public roadways.

**7.** Appellees baldly assert that the FMCSR impose two non-delegable duties upon motor carriers to ensure that they operate safe vehicles. Appellees' Br. at 25. They set forth the alleged duties, but otherwise the argument is completely undeveloped. As such, we find the argument waived. *See* Ind. Appellate Rule 46(A)(8)(a) (requiring that all arguments be supported by cogent reasoning and cita-

## 2. The Fourth Exception

■ This exception makes an employer liable for the negligence of an independent contractor where the act to be performed will probably cause injury to others unless due precaution is taken. *Carie v. PSI Energy, Inc.,* 715 N.E.2d 853, 856 (Ind. 1999). Appellees contend that Allied Waste and IBC are liable for their independent contractors' negligence because hauling sludge will probably cause injury to other motorists unless due precaution is taken.

■■ We have previously stated,

For this exception to apply, it must be established that the principal, at the time of the contract, should have foreseen that the performance of the work or the conditions under which it was to be performed would, absent precautionary measures, probably cause injury. The danger that the principal must foresee must be substantially similar to the accident that produced the injury. More than a mere possibility of harm is required; the defendant should have foreseen the probability of such harm. Thus, application of this exception requires an examination of whether, at the time an individual was employed as an independent contractor, there existed a peculiar risk which was reasonably foreseeable and which recognizably called for precautionary measures.

*Walker,* 887 N.E.2d at 136 (citations and quotation marks omitted). "This doctrine does not render the principal liable for the contractor's failure to take normal precautions incident to the activity to be carried out." *PSI Energy, Inc. v. Roberts,* 829 N.E.2d 943, 955 (Ind.2005), *clarified on reh'g,* 834 N.E.2d 665, *abrogated on other grounds by Helms v. Carmel High Sch. Vocational Bldg. Trades Corp.,* 854 N.E.2d 345 (Ind.2006). " 'It is not concerned with taking routine precautions, of a kind which any careful contractor could reasonably be expected to take, against all of the ordinary and customary dangers which may arise in the course of the contemplated work.' " *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 413 cmt. b.). The due precaution exception applies only when the "risk involved is something more than the routine and predictable hazards generally associated with a given occupation: it must be a risk unique to the circumstances of a given job." *McDaniel v. Bus. Inv. Group,* 709 N.E.2d 17, 22 (Ind.Ct.App.1999), *trans. denied.*

As to the case at bar, we cannot say that the risk of a collision with another vehicle is more than a routine and predictable hazard associated with hauling sludge. *See Walker,* 887 N.E.2d at 137 ("While it may be possible that the act of hauling logs may cause injury unless certain precautions are taken, we cannot say that the act in and of itself establishes that injury will probably occur."). We conclude that Appellants have demonstrated that neither the second or fourth exceptions to the general rule of nonliability of a principal for a contractor's negligence are applicable and that they are entitled to judgment as a matter of law.[8] We therefore reverse the

tions to authority); *Romine v. Gagle,* 782 N.E.2d 369, 386 (Ind.Ct.App.2003) ("A party generally waives any issue for which it fails to develop a cogent argument or support with adequate citation to authority and portions of the record.").

8. In their briefs, IBC presents an argument negating the borrowed servant doctrine, and

Allied Waste presents an argument negating that Appellees had rights under the Purchase Order. However, Appellees did not argue those theories of liability in their response to Appellants' motions for summary judgment or on appeal. As such, it is unnecessary to address those theories.

trial court's order denying Allied Waste's and IBC's motions for summary judgment.

Reversed.

BRADFORD, J., concurs.

BROWN, J., concurs in part, dissents in part with separate opinion.

BROWN, Judge concurring in part and dissenting in part.

I respectfully concur in part and dissent in part. I concur with the majority's determinations that: (1) Allied Waste and IBC are not liable for the negligence of Wireman and Irvine under the Federal Motor Carrier Safety Regulations; (2) Allied Waste and IBC are not liable for the negligence of Wireman and Irvine under the fourth exception to the general rule of nonliability of a principal for a contractor's negligence; and (3) IBC is not liable for the negligence of Wireman and Irvine under the second exception to the general rule of nonliability of a principal for a contractor's negligence. However, I dissent from the majority's determination that Allied Waste is not liable under the second exception to the general rule of nonliability of a principal for a contractor's negligence. Rather, I conclude that genuine issues of material fact exist on this issue, and I would affirm the trial court's denial of the motion for summary judgment.

As noted in the majority opinion, under *Bagley v. Insight Communications Co.*, 658 N.E.2d 584 (Ind.1995), a principal is not liable for the negligence of an independent contractor unless one of five exceptions applies. The five exceptions are:

(1) where the contract requires the performance of intrinsically dangerous work;

(2) where the principal is by law or contract charged with performing the specific duty;

(3) where the act will create a nuisance;

(4) where the act to be performed will probably cause injury to others unless due precaution is taken; and

(5) where the act to be performed is illegal.

658 N.E.2d at 586. I agree with Appellees that the second exception is applicable here.

The eight-page purchase order between Mittal and Allied Waste provided, in part:

\*    \*    \*    \*    \*    \*

The purpose of this order is to furnish our partial requirements of: Bulk stream removal haz/non-haz removal disposal non hazard

\*    \*    \*    \*    \*    \*

Remove, properly pkg., label, transport & dispose of waste associated w/the job. Transport directly to off-side EPA permitted disposal facility approved by Inland Steel. DOT approved shipping containers to be provided by contractor.

Provide necessary svcs. to obtain required disposal permits and/or approvals at EPA approved/permitted disposal sites prior to transport of items to disposal site. All disposal sites must be identified to Ispat Inland.

Provide appropriately permitted, licensed & insured transport vehicles. Include the following information:

–DOT/EPA carrier safety rating

–EPA identification #

–Certificate(s) of insurance

–State transporter permit number

–Spill Contingency Plan(s)

\*    \*    \*    \*    \*    \*

Supplier warrants that the work and services shall be performed with that degree of skill, care, and judgement customarily accepted as sound, quality, pro-

fessional engineering practice and procedure and that the supplier shall exercise sufficient diligence to insure the technical correctness and accuracy of the work and services.

\*　　\*　　\*　　\*　　\*　　\*

Appellant's Appendix at 209–211.

I conclude that this case is more like the contracts in *Stumpf v. Hagerman Constr. Corp.*, 863 N.E.2d 871 (Ind.Ct.App.2007), *trans. denied*, and *Perryman v. Huber, Hunt & Nichols, Inc.*, 628 N.E.2d 1240 (Ind.Ct.App.1994), *trans. denied*, than the contracts in *Walker v. Martin*, 887 N.E.2d 125 (Ind.Ct.App.2008), *reh'g denied, trans. denied*, and *Armstrong v. Cerestar, USA, Inc.*, 775 N.E.2d 360 (Ind.Ct.App.2002). *trans. denied*, which are relied upon by the majority. Under the Purchase Order, Allied Waste assumed a contractual duty to transport the waste with "appropriately permitted, licensed & insured transport vehicles" and to check the DOT/EPA safety ratings. Appellant's Appendix at 209. I conclude that Allied Waste assumed a contractual duty to provide safe transport for the waste, and the second *Bagley* exception applies. Further, genuine issues of material fact exist regarding whether Allied breached its duty and, if so, whether the breach was a proximate cause of Appellees' damages.

For these reasons, I respectfully concur in part and dissent in part.